Filed 9/17/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>SHELDON VAUGHN SILAS et al.,<br><br>        Defendants and Appellants. | A150512<br><br>(Contra Costa County<br>Super. Ct. No. 5-140709-7) |

Defendants Sheldon Silas, Reginald Whitley, Lamar Michaels, and Linda Chaney, all of whom are Black, were tried for various crimes related to the murders of Christopher Zinn and Brieanna Dow, who were also Black. During jury selection, defendants brought *Batson/Wheeler*[1] motions to challenge the prosecutor's exercise of peremptory strikes against three Black prospective jurors, including one who expressed support for Black Lives Matter. The trial court denied the motions, and the seated jury, which had two Black members, returned convictions on all the charged crimes.

We conclude that the *Batson/Wheeler* motion involving the prospective juror who expressed support for Black Lives Matter was improperly denied. Defendants established a prima facie case of discrimination at the first stage of the *Batson/Wheeler* analysis, and the prosecutor's proffered reasons for the strike—that the juror was hostile when asked about supporting Black Lives

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

Matter and had "anti-prosecution issues"—should not have been credited. Thus, insufficient evidence supports the conclusion at the third stage of the analysis that the peremptory strike was not " 'motivated in substantial part by discriminatory intent.' " (*Foster v. Chatman* (2016) 578 U.S. 1023, 136 S.Ct. 1737, 1754 (*Foster*).)  Because the error was structural, we reverse the judgments and remand for a new trial.[2]

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

In October 2012, 24-year-old Zinn and his girlfriend, 21-year-old Dow, were shot to death in an unincorporated area of Contra Costa County between Pittsburg and Antioch.  Evidence was presented at trial that Silas and Whitley, brothers and members of a San Francisco street gang, suspected Zinn, a fellow gang member, had stolen guns from them.  Shortly before the murders, the brothers attacked Zinn outside his and Dow's apartment building, where Whitley and Chaney—Whitley's girlfriend—also lived.  Zinn and Dow ran away, and Silas and Whitley pursued them in two separate cars, one of which was driven by Michaels, the brothers' cousin.  A few minutes later, both victims were shot to death on the side of the road.  The

---

[2] Defendants raise numerous other claims, both jointly and individually, which we do not address in light of our disposition.  Some of these claims involve pretrial rulings, such as the denial of Chaney's motion to sever her trial from that of her codefendants, that arguably are not rendered moot by our determination that defendants are entitled to a new trial.  Our decision not to address such claims is without prejudice to defendants' ability to challenge the same rulings in a future appeal.

Whitley also filed two petitions for writ of habeas corpus in which he claims he received ineffective assistance of counsel in the proceedings below.  By separate orders, we deny as moot the petitions in case nos. A155256 and A159988.

prosecution's theory at trial was that Silas was the actual killer and Whitley and Michaels were aiders and abettors.

Silas, Whitley, and Michaels were originally charged in October 2012. Subsequently, Chaney and Lisa Arnold—Silas and Whitley's mother—were charged in the same case with various counts related to attempts to dissuade two witnesses from testifying and a count of accessory after the fact. Chaney was also charged with 49 felony counts of entering jail grounds as an ex-convict.

After the male defendants waived time, Chaney and Arnold were tried together in the fall of 2014. Chaney was found guilty of all counts of entering jail grounds as an ex-convict, but she was acquitted of one count of witness dissuasion, and the jury hung on the remaining three counts against her.[3] The lone holdout juror on the hung counts was Black.

Trial of the three male defendants and retrial of Chaney on the three hung counts began in October 2015. During jury selection, the prosecutor exercised peremptory challenges against a total of six Black potential jurors. The trial court found no *Batson/Wheeler* violation as to any of the six, and the seated jury had no Black members except for one alternate juror. After jury selection concluded but before the presentation of evidence began, the court granted a mistrial because Whitley's original trial counsel unexpectedly died.

The trial at issue began in August 2016. The operative information charged Silas, Whitley, and Michaels with two counts of murder, one count of

---

[3] The jury also hung on all counts involving Arnold, and her retrial was severed from the trial of the defendants before us. We do not discuss her further.

conspiracy to commit murder, and other firearms-related felonies.[4] Numerous sentencing enhancements were also alleged, including multiple-murder and gang-murder special circumstances, firearm enhancements, and gang enhancements.[5]  In addition, it was alleged that Silas and Michaels were released on bail when they committed the offenses.[6]  Chaney was charged with one count of conspiracy to dissuade a witness, one count of witness dissuasion, and one count of being an accessory after the fact, all

---

[4] The murder charges were brought under Penal Code section 187, subdivision (a), and the murder conspiracy charge was brought under Penal Code sections 182, subdivision (a)(1), and 187, subdivision (a).  In addition, Whitley was charged with possession of a firearm by a felon under Penal Code section 29800, subdivision (a)(1), Silas and Michaels were charged with possession of an assault weapon under Penal Code section 30605, subdivision (a), and Michaels was charged with unlawful firearm activity under Penal Code section 29815, subdivision (a).  All further statutory references are to the Penal Code unless otherwise noted.

[5] The gang-murder special circumstance was alleged as to both murders under section 190.2, subdivision (a)(22), and the multiple-murder special circumstance was alleged under section 190.2, subdivision (a)(3).  It was alleged that the three male defendants committed all the charged crimes for the benefit of a street gang under section 186.22, subdivision (b)(1)(A) (firearms-related charges) and (b)(5) (murder and conspiracy charges).  In addition, it was alleged under section 12022.53, subdivision (d), that Silas personally and intentionally discharged a firearm causing death in the course of both murders and the conspiracy to commit murder, under section 12022.53, subdivision (b), that Silas and Whitley personally used a firearm in the course of Zinn's murder and the conspiracy to commit murder, and, as to all three men and all three homicide offenses, that a principal personally and intentionally discharged a firearm causing death, personally and intentionally discharged a firearm, and personally used a firearm under section 12022.53, subdivisions (b)–(e).

[6] These allegations were made under section 12022.1.

felonies. It was also alleged that she committed the latter two crimes for the benefit of a street gang.[7]

During jury selection, the prosecutor exercised peremptory challenges against three Black prospective jurors, and each challenge was the subject of a *Batson/Wheeler* motion. The trial court found that no prima facie case of discrimination was established as to the first two jurors, both of whom the prosecutor had unsuccessfully challenged for cause. As to the third challenge, the court found a prima facie case, but it accepted the prosecutor's reasons for the challenge and denied the motion. The seated jury had two Black members.

The jury convicted the male defendants of first degree murder of Zinn and conspiracy to commit murder, Silas and Whitley of first degree murder of Dow, and Michaels of second degree murder of Dow. The jury also found true as to all male defendants the gang-murder special circumstance for both murders and the multiple-murder special circumstance, as well as all other accompanying enhancements charged.[8] In addition, the jury found Silas guilty of possessing an assault weapon, Whitley guilty of being a felon in possession of a firearm, and Michaels guilty of possessing an assault weapon

---

[7] The witness dissuasion charge was brought under section 136.1, subdivision (c)(1), the witness dissuasion conspiracy charge was brought under sections 136.1, subdivision (c)(1), and 182, subdivision (a)(1), and the accessory charge was brought under section 32. The gang enhancements were alleged under section 186.22, subdivision (b)(1)(A) (accessory count) and (b)(4) (witness dissuasion count). Chaney was also erroneously charged with the count of witness dissuasion of which she had previously been acquitted, and the charge was subsequently removed from the jury's consideration.

[8] Although the jury acquitted Michaels of first degree murder of Dow, the verdict form for the lesser included offense of second degree murder also included the gang-murder special circumstance, and the jury found the special circumstance true even though it does not apply to that crime. (See § 190.2, subd. (a).) The trial court subsequently struck the finding.

5

and unlawful firearm activity, and found true the gang allegations accompanying these counts. Finally, Chaney was found guilty of all three counts charged against her, but the jury found not true the accompanying gang allegations.

Silas was sentenced as follows: (1) for the murder of Zinn, life without the possibility of parole (LWOP), plus consecutive terms of 25 years to life for personally and intentionally discharging a firearm causing death, 10 years for committing the crime for a gang's benefit, and two years for the bail enhancement; (2) for the murder of Dow, LWOP, plus consecutive terms of 25 years to life for personally and intentionally discharging a firearm causing death and 10 years for committing the crime for a gang's benefit; and (3) for possession of an assault weapon, three years plus a consecutive term of four years for committing the crime to benefit a street gang. The trial court indicated that Silas's total term was LWOP plus 70 years to life plus seven years.[9]

Whitley was sentenced on both murder convictions to LWOP, plus a consecutive term of 25 years to life for a principal's personal and intentional discharge of a firearm causing death. For the conviction of being a felon in possession of a firearm, he was sentenced to three years plus a consecutive term of four years for the accompanying gang enhancement, for a total term of LWOP plus 50 years to life plus seven years.

---

[9] This calculation appears to omit the consecutive two-year term imposed for the bail enhancement, but we need not address this discrepancy or any other potential sentencing errors in light of our disposition. Also, in summarizing the defendants' sentences, we do not detail additional convictions or enhancements that were stricken or for which terms were imposed but stayed.

6

Michaels was sentenced for Zinn's murder to LWOP, plus consecutive terms of 25 years to life for a principal's personal and intentional discharge of a firearm causing death and two years for the bail enhancement. Michaels was sentenced for Dow's murder to 15 years to life, plus a consecutive term of 25 years to life for a principal's personal and intentional discharge of a firearm causing death. For possession of an assault weapon, he was sentenced to three years plus a consecutive term of four years for the accompanying gang enhancement, and for unlawful firearm activity, he was sentenced to eight months plus a consecutive term of one year for the accompanying gang enhancement. Thus, he received a total term of LWOP plus 67 years to life plus eight years, eight months.

Finally, Chaney was sentenced to four years for dissuading a witness, plus a consecutive term of seven years for her other convictions from the previous trial, for a total term of 11 years.

II.
DISCUSSION

Defendants contend that their three *Batson/Wheeler* motions should have been granted. We agree with them with regard to the motion involving Juror 275.

A.      The Batson/Wheeler *Framework*

"The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and [the defendant's] right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.) The discriminatory use of peremptory challenges harms not only defendants but also "the excluded jurors and the community at large," as it

7

"forecloses a significant opportunity to participate in civic life" and
" 'undermine[s] public confidence in the fairness of our system of justice.' "
(*Johnson v. California* (2005) 545 U.S. 162, 172 (*Johnson*); *Powers v. Ohio*
(1991) 499 U.S. 406, 409.)  "The exclusion by peremptory challenge of a single
juror on the basis of race or ethnicity is an error of constitutional magnitude
requiring reversal."[10]  (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

Claims that a prosecutor impermissibly exercised a peremptory
challenge based on group bias require a three-step analysis.  (*People v.
Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).)  First, the defendant
"must demonstrate a prima facie case by showing that the totality of the
relevant facts gives rise to an inference of discriminatory purpose."  (*Ibid.*)
" ' "Discriminatory purpose" . . . implies more than intent as volition or intent
as awareness of consequences.  It implies that the decisionmaker . . . selected
. . . a particular course of action at least in part "because of," not merely "in
spite of," its adverse effects upon an identifiable group.' "  (*Hernandez v. New
York* (1991) 500 U.S. 352, 360 (plur. opn. of Kennedy, J.).)[11]  Nonetheless, the
prima facie case is a " 'low threshold,' " requiring a showing only that
" 'discrimination *may* have occurred.' "  (*People v. Johnson* (2019) 8 Cal.5th
475, 538.)

---

[10] An alleged *Batson/Wheeler* error may be found harmless where (1) it
pertains to a prospective juror who would have been an alternate and (2) no
alternates were called onto the main panel.  (*People v. Mills* (2010) 48 Cal.4th
158, 182.)  This principle does not apply here, because although Juror 275
would have been seated as an alternate juror had she not been challenged,
three alternate jurors were randomly chosen to be seated on the main jury.

[11] In other words, the *Batson* framework "is not designed to root out
implicit bias."  (*Shirley v. Yates* (9th Cir. 2015) 807 F.3d 1090, 1110, fn. 26;
see *Miller-El v. Dretke* (2005) 545 U.S. 231, 267–268 (conc. opn. of Breyer,
J.).)

Second, if a defendant makes a prima facie showing, the burden shifts to the prosecutor to "state nondiscriminatory reasons for the challenges." (*People v. Hardy* (2018) 5 Cal.5th 56, 75; *Gutierrez, supra*, 2 Cal.5th at p. 1158.) The prosecutor's reasons need not be "persuasive, or even plausible. 'At this . . . step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " (*Purkett v. Elem* (1995) 514 U.S. 765, 767–768 (*per curiam*).)

Third, if the prosecutor provides a facially adequate explanation for the challenge, "the trial court must decide whether the [defendant] has proven purposeful discrimination," which requires a showing that it was more likely than not that the challenge was " 'motivated in substantial part by discriminatory intent.' " (*Foster, supra*, 578 U.S. 1023, 136 S.Ct. at p. 1754; *Gutierrez, supra*, 2 Cal.5th at p. 1158.) At this step, the focus is on "the credibility of the prosecutor's neutral explanation. Credibility may be gauged by examining factors including but not limited to ' " 'the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*Gutierrez*, at p. 1168.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612–613.)[12]

---

[12] Assembly Bill No. 3070 (2019–2020 Reg. Sess.), legislation that will significantly modify the *Batson/Wheeler* framework, was signed into law in 2020. Among other things, it provides that some reasons for striking a juror that were relied on here, including distrust of law enforcement and the criminal legal system, are presumptively invalid. (Code Civ. Proc., § 231.7, subd. (e).) The legislation has no bearing on this appeal, however, because it applies prospectively to trials "in which jury selection begins on or after January 1, 2022." (*Id.*, subd. (i).)

*B.    Additional Facts*

Governing authority is clear that " '*all* of the circumstances that bear upon the issue of racial animosity must be consulted' " to evaluate a *Batson/Wheeler* motion.  (*Foster*, *supra*, 578 U.S. 1023, 136 S.Ct. at p. 1748.) The relevant circumstances on which a defendant may rely include not only "the record of jury selection" in the trial at issue but also "historical evidence" from past trials.  (*Flowers v. Mississippi* (2019) 588 U.S. __, 139 S.Ct. 2228, 2245, 2248.)  Here, in addition to the record of jury selection in this trial, our record contains documents from Chaney and Arnold's 2014 trial, the 2015 jury selection in this case before a mistrial was declared, and a 2015 trial in an unrelated case during which a different judge granted a *Batson/Wheeler* motion to overturn a peremptory challenge made by the same prosecutor. Defendants relied on all these sources in challenging the prosecutor's exercise of peremptory strikes in this trial, and we discuss them in more detail as they were presented in the proceedings below.

Although we need not evaluate all three challenged *Batson/Wheeler* rulings to conclude that reversal is required, we describe in some detail the factual circumstances surrounding the rulings because they "bear[] on the question whether the excusal of [any one of the jurors] constituted unlawful discrimination."  (*People v. Scott* (2015) 61 Cal.4th 363, 392 (*Scott*).)  The defense challenges to the striking of these three potential jurors in particular, and racial issues more generally, were extensively discussed by the prosecutor, four defense attorneys, and trial court (all of whom are white).

In describing these circumstances, we first discuss the evidence directly related to Juror 275, even though she was not the first of the three jurors to be examined.  We then discuss the evidence related to or revealed during the examination of the other two potential jurors.  This evidence shows that

10

when the prosecutor asked Black potential jurors questions with racial implications, such as questions about Black Lives Matter, she sometimes became antagonistic and tended to reject responses that differed from her preconceived notions of the correct answers.  It shows that the prosecutor sometimes incorrectly recounted the record in defending against *Batson/Wheeler* challenges.  It shows that the prosecutor unsuccessfully tried to have the Black hold-out juror in the Arnold-Chaney trial dismissed by claiming that the juror had refused to deliberate, rather than accepting that the juror simply had fundamental disagreements with the other jurors.  And it shows that the prosecutor had a *Batson/Wheeler* objection sustained against her by a trial judge in a different case and other prosecutors in the Contra Costa County District Attorney's Office have engaged in *Batson/Wheeler* violations.  As we will explain, this evidence collectively undermines the conclusion that the peremptory strike of Juror 275 was not " 'motivated in substantial part by discriminatory intent.' " (*Foster*, *supra*, 578 U.S. 1023, 136 S.Ct. at p. 1754.)

### 1.    Juror 275

Juror 275 was a 25-year-old Black woman from Concord who worked as a mail carrier and had previously been employed as a security guard.  One of the questions on the juror questionnaire asked about involvement "with any law or justice-focused special interest groups" and gave several examples across the political spectrum, including "Black Lives Matter" and "Blue Lives Matter."  In response, Juror 275 wrote, "I support Black [L]ives Matter."  She also responded affirmatively to a question asking whether jurors held "any strong feelings about whether the present criminal justice system treats any person differently than others based on gender, race, religion, or national origin," but she indicated that this would not "affect [her] as a juror."

During its opening remarks to Juror 275's group, the trial court addressed at length the jury's duty to evaluate witness credibility.[13]  After explaining how the jurors should evaluate witnesses in general, the court discussed two examples, expert witnesses and law enforcement officers.  As to law enforcement witnesses in particular, the court stated that while some people might have very strong positive or negative reactions to them, the jurors needed to judge their credibility like that of any other witness.  Concluding its overall remarks about witness credibility, the court asked the jurors whether they all could "follow [its] instruction with regard to evaluation of witness testimony," and stated that it "[saw] all nodding heads."

As the trial court later explained, it observed that Juror 275 did *not* nod her head at this juncture, but it nevertheless "said everybody nodded their head because [it] didn't want to put her on the spot."  Thus, when the court individually addressed Juror 275, it said, "[Y]ou wrote in your questionnaire that you support Black Lives Matter.  I also notice you didn't nod your head when I talked about police officers.  Is there a concern that you have about police officers should they testify?"  The juror responded, "No."  The court then asked, "So if a police officer takes the stand and another individual takes the stand, are you going to treat the police officer['s] testimony as you would anybody else's testimony?"  Juror 275 responded, "Yes."

After questioning Juror 275 about a relative who had been arrested, the trial court asked whether she had "a negative impression either of the way the police handled the arrest or the booking, the way the prosecutor handled the charging, anything at all that left [her] with a negative

---

[13] After excusals for hardships, which alone took several days, the remaining potential jurors were questioned in 16 groups of approximately 16 jurors each, with each group requiring about a day's worth of voir dire.

12

impression." The juror responded, "No." Moving to Juror 275's indication on her questionnaire that she had strong feelings about the justice system's treatment of people in different groups, the court asked, "What are your feelings about how [it] treats people differently?" Juror 275 responded, "My feelings about sentencing based on the crime. I don't think it's necessarily fair for—I've noticed that Black people—how I feel is that Black people are being sentenced longer than other races." The court then segued to explaining that sentencing is not the jury's responsibility and did not ask Juror 275 further questions about her views on the justice system, except to confirm that her views about sentencing would not affect her ability to be fair.

When questioning Juror 275, the prosecutor sought to confirm with the juror that "one of the things that [the juror did] socially [was she] support[ed] Black Lives Matter." Juror 275 stated she supported the movement but was "not in anything social like as in group-wise, no."

The prosecutor responded, "Okay. And that's kind of [what] I was really getting at. There are certain movements with Black Lives Matter, as I'm sure you know, that are basically civil disobedience where [¶] . . . [¶] you have riots." Juror 275 responded, "Right," before defense counsel successfully objected. The following exchange then occurred[14]:

| [D.A.]: | Where you have individuals as part of that particular movement that, for instance, destroy property that's not their own. Would you agree with that? |
|---|---|
| [JUROR 275]: | No. |
| [D.A.]: | Okay. And would you agree that during certain demonstrations that people may break into stores as |

---

[14] The ellipses below denote places where defense counsel unsuccessfully objected to the prosecutor's questioning.

13

part of that particular demonstration?

. . .

[JUROR 275]:    Do I agree with it?  Meaning would I do it?

[D.A.]:    No, that it happens.

[JUROR 275]:    Like have I seen it happen?

[D.A.]:    No.  Just do you think it happens at all during some of those demonstrations?

[JUROR 275]:    Yeah, it's happened.

[D.A.]:    Okay.  In general, your support for Black Lives Matter, do you agree or do you disagree with that type of behavior, that is, destroying other people's property?

. . .

[JUROR 275]:    Do I agree with people destroying other[s'] property?

[D.A.]:    As part of their statement of a demonstration.

[JUROR 275]:    No, I don't.

The prosecutor subsequently challenged Juror 275 for cause, pointing to Juror 275's responses to both the trial court's questions and the prosecutor's own questions.  As to the court's questions, the prosecutor claimed that Juror 275 was not responsive, failing to provide "further clarification as to what . . . her particular views were about law enforcement," until when asked about the justice system "she finally did offer up that there [were] issues about punishment."

As to the questioning about Black Lives Matter, the prosecutor stated it was meant to elicit whether Juror 275 "recognize[d] whether . . . it was a . . .

14

social activist group." The prosecutor characterized Juror 275 as "originally den[ying] knowing of the civil unrest of open rioting where private property is damaged, which is well-known within the media." According to the prosecutor, Juror 275 "rolled her eyes" while the prosecutor was asking "about whether . . . places were burglarized," and Juror 275's "response actually became more and more hostile when the defense attorneys were objecting," prompting the prosecutor to "end[] that particular line of questioning." Stating that Juror 275's "attitude was completely different" when being questioned by defense counsel, the prosecutor "ask[ed] the Court to find that there may be an apparent bias that [Juror 275] is refusing to acknowledge to this particular Court based on her behavior and her answers in total."

Silas's counsel then explained that his objection to the prosecutor's questions was her implication that Black Lives Matter stands for violence and property destruction, when in fact "[t]he people who speak for that organization do not advocate violence, rioting, anything like that." In counsel's view, Juror 275 "was taken aback by that, as [he] was." Similarly, counsel for Michaels believed that the prosecutor's "questioning . . . was attacking this juror, in some ways accusatory, [for] her support for . . . this group," and his "sense from what [he] could hear in [Juror 275's] voice is she took it the same way. And . . . like any person attacked, reacted perhaps in a bit of an off-putting way."

Whitley's counsel took an even stronger view, stating that "this was an assaultive and aggressive and accusatory type of questioning." He explained, "[T]he focus of [the prosecutor's] questions was not what the purpose behind Black Lives Matter was, and that is to raise consciousness. The focus of [the prosecutor's] questioning was that it was a quasi-criminal, civilly disobedient,

15

vandalizing group of Black people . . . and those whites who supported them. [¶] And it was that sort of accusatory questioning that if [the prosecutor] thinks she can engage in [it] and then when she gets a rise out of a juror say, 'Oh, the juror doesn't like me,' I think that is the height of manipulation."

Chaney's counsel took issue with the prosecutor's "spinning" of Juror 275's responses "to say . . . that the juror was denying that any of those actions take place by members of Black Lives Matter. That wasn't the approach or the response. It was, 'No, I don't agree with those criminal actions.'" In reply, however, the prosecutor reiterated that her "question to [Juror 275] was to ask her whether . . . she agreed with me that during some of these social movements there are, in fact, vandalisms committed . . . by this particular group. . . . It was not asking her if she does it, if she participates in it, but merely a question of her to see if she was going to acknowledge that or not. And she denied it."

The prosecutor then denied she was "trying to get a rise out of [Juror 275]," explaining that "[w]hen you have a social organization that does, in fact, from time to time and, obviously not all members, act in social disobedience, there's very few questions that you can ask them where they're going to admit [to] that particular behavior." Clarifying that she was talking about "jury nullification" specifically, the prosecutor stated, "The only way that I can probe at possible bias that is not willing to be exposed is to ask questions about whether . . . individuals could agree that maybe there is a bad portion of this particular movement that they're in. And ultimately I think everyone here would agree that there are a lot of proponents who disagree with all of the rioting that is occurring; but if [one] were to straight[]out ask them[,] 'Does this happen?'[,] their answer would be 'yes.'

16

They're not hiding that. And that's where my issue comes in with the answers from [Juror 275]."

The trial court stated it had permitted the questions because "one of the issues with Black Lives Matter[] is there are not leaders. It's a nonstructured organization. . . . [¶] So there is not a spokesperson [who] says, 'I'm speaking for them.' And at times, you know, the social media is what brings them together and causes them to, you know, block the Bay Bridge and commit certain acts of civil disobedience and agree to meet somewhere and do what they do. So there isn't per se advocacy of it. But there isn't also per se somebody saying, 'We do not support this. We do not allow this to happen.'" Although observing that "[p]erhaps the word 'rioting' was loaded," the court agreed with the prosecutor that "it is well-known that Black Lives Matter does organize civil disobedience." The court then told the prosecutor that if she questioned another juror "who supports Black Lives Matter," she would "have a right to go into whether or not they're supporting civil disobedience."

Characterizing the issue as "a very close call," the trial court ultimately denied the challenge for cause. It observed that Juror 275 had consistently said she could be fair, had said she could "set aside her feelings about sentencing based on race," and had said she did not support property destruction by some "followers" of Black Lives Matter.

At a later hearing, defense attorneys reiterated concerns involving the prosecutor's questioning of Juror 275 about Black Lives Matter. The trial court responded that it believed Juror 275's attitude toward the prosecutor did not change once the prosecutor asked her about Black Lives Matter. Rather, throughout the court's and prosecutor's questions, the juror "was reserved, reluctant to respond, didn't make eye contact, . . . her body

17

language was completely shut off, crossed arms, crossed legs, holding . . . onto her purse as though she was about to leave . . . . And she did not warm up." The court also observed, however, that the prosecutor's approach to questions about Black Lives Matter was abrupt and that the prosecutor "did use what [the court] felt was a strong word, which is rioting, and . . . it can cause a reaction." Ultimately, the court determined that the prosecutor "ha[d] every right to question somebody who supports that movement," including about times when "Black Lives [Matter] demonstrations evolve into horrendous rioting and damage to—ultimately many times—to Black store owners' stores."

The prosecutor subsequently exercised a peremptory challenge against Juror 275, and defendants brought a *Batson/Wheeler* motion to set aside the challenge. The trial court found that defendants had not established a prima facie case of discrimination and denied the motion, observing, "I don't think this is close." After the court asked whether the prosecutor would like "to put anything on the record," the prosecutor stated, "I think this is going to be a clear and prime example to our appellate courts of *Batson/Wheeler* completely out of control. On this jury, ready to be sworn, [are] two African-American females. It's approximately 25 percent African American of the wom[e]n who are sitting in the jury. This is a clear example of how defense attorneys exploit what truly is a needed opportunity and . . . make a joke out of jury selection." The prosecutor then indicated she would give her reasons for the peremptory challenge later.

At a subsequent hearing, the prosecutor put on the record the following reasons for striking Juror 275: "She was openly hostile, to say the least, when I was questioning her about Black Lives Matter. She disagreed that Black Lives Matter, there is a contingent within it [that] destroys property or

18

. . . riots. That's just absolutely not true or . . . she has chosen to close her eyes to it. [¶] She has strong opinions of law enforcement in the negative way. And she did not nod to treat law enforcement equally. [¶] She arrived late. She wanted absolutely nothing to do with this case. And with her arms crossed, was openly angry with me in my questioning, for whatever reason."

Addressing Juror 275 as well as Juror 211, whom we discuss next, the trial court elaborated on its finding of no prima facie case as to either juror. It explained, "Both jurors . . . had a myriad of anti-prosecution issues that were vocalized by [the prosecutor] and this Court so observed during the cause challenge[s] as well as today. I came extremely close to granting both requests but because the potential jurors stated they could set aside these biases, I did not grant the challenges for cause. In retrospect, I could very easily have gone [a] different direction and granted the cause challenges."

### 2.    Juror 211

Juror 211 was examined before Juror 275. She was a 34-year-old Black woman who had a degree in biological sciences and worked as a disability insurance program representative. She had lived in Richmond for decades, and in response to a question on the juror questionnaire asking jurors to describe the area in which they grew up, she wrote, "I would describe Richmond, CA as a community of hope, pride and love. I have had many opportunities growing up to advance academically and socially. The pride of Richmond . . . keeps the city striving and the love that is given within the community strengthen[s] the bond of one another."

Another question on the questionnaire asked jurors whether they had "any strong opinions about how police do their jobs," and, if so, what their opinion was and how they thought it might affect them as jurors. Juror 211 answered affirmatively and wrote, "I will be pay[ing] close attention to details

19

to ensure the police did not do anything unethical."  In response to another question asking whether jurors "ever had a lasting experience with law enforcement, either positive or negative," she responded that she had and explained, "My experience was with the Sac State campus police, I was wrongfully pulled over for running a stop light.  I went to court and won.  This experience will not affect me [as] a juror."

Juror 211 also checked "Yes" in response to the following question:  "Do you have any strong opinions about how the court process operates with persons accused of crimes?"  Underneath the question, she wrote, "What is strong?"  In response to a follow-up question, she explained that her opinion "[would] affect [her] as a juror to ensure everyone is given a fair [trial] and chance."  Finally, in response to the question asking whether jurors had "strong feelings about whether the present criminal justice system treats any person differently than others based on gender, race, religion, or national origin," Juror 211 answered affirmatively but stated, "It would not affect me as a juror.  As a juror your thought process has to be unbias[ed]."

On the first morning of her group's voir dire, Juror 211 arrived at court approximately 40 minutes late.  When the trial court asked her to explain, the juror apologized for being late and explained that she had spent the previous night in Fairfield to help her cousin move and had encountered unanticipated traffic.  She then confirmed that if picked to be a juror, she would normally be coming from Richmond where she lived, not Fairfield.  The court thanked the juror for her apology and said, "We'll keep you.  Just be reminded to please be on time."

Juror 211 failed to sign the last page of her questionnaire, which required a declaration under penalty of perjury that the information she had given was "true and correct."  At the trial court's request, she affirmed on the

record that "everything that [she] put on the questionnaire [she had] stated under the penalty of perjury."

The trial court also asked Juror 211 about her answers to certain questions on the questionnaire. First, in regard to Juror 211's statement that she would pay close attention to make sure the police did not do anything unethical, the court said, "It's certainly important to be careful about every witness [who] testifies. However, it's presuming that the police were likely to do something unethical that would be inappropriate. Does that make sense?" Juror 211 confirmed that she understood, and she responded, "Of course," when the court asked whether she would "be able to view a police officer testifying the same way [she] would any other witness [who] testified."

The trial court also referred to Juror 211's statement, in response to the question about "strong opinions about the court process," that the juror would want "to ensure everyone is given a fair trial and chance." The court stated, "[W]e are thrilled to have the people [who] want to make sure the Court is fair and everyone [is] being given a fair chance. It's just holding up the presumption that it's not going to be fair that could be inappropriate. Do you see the difference?" Juror 211 responded that she did, saying, "My question was 'strong.' It's just a vague word. Like what are we talking about? Are we talking about a scale of one to ten? I wasn't sure how to judge the word 'strong.' That's why I questioned that, you know. So 'strong' meaning what? Like will it affect me and make me biased? Will it make me unethical? No, not that strong."

When the prosecutor returned to this topic later, Juror 211 reiterated that she did not have "any strong opinions" about the criminal court process that would make her biased or unethical. The prosecutor also asked the juror to describe her "strong feelings" about the justice system's disparate

21

treatment of people based on race or other categories, and the juror responded, "I know it happens, so my opinion is that it's not right, but . . . I haven't experienced that personally. I can't give a detailed . . . opinion about [it]. I can just tell you that it's unfair."

The prosecutor questioned Juror 211 at length about Richmond. After confirming that Juror 211 had "deep roots in Richmond," the prosecutor asked how the city had changed over time, and the juror responded, "Demographically it's changed. There's more Latinos in our community. Changed as far as school district, the way the schools are r[u]n, those are different. I would say those are two of the main things that I've seen. More businesses have closed, so those are different."

The prosecutor asked, "How about crime, do you think it's changed?" Juror 211 responded, "It's changed for the better. . . . [¶] . . . [¶] I think the crime rate has—the murder rate has decreased in Richmond." Referring back to Juror 211's statement that there are "strong family roots in Richmond," the prosecutor then asked, "[W]ould you agree with me that there can be very strong and loving families, and there can be families who pass on criminal activity?" Before the trial court sustained a defense objection to the question, Juror 211 responded, "Of course." The prosecutor also asked if there were gangs in Richmond and in Juror 211's particular area. Juror 211 stated there were, but she denied that it was "pretty noticeable as to who is involved in a gang and who is not" or that gangs were "divided in any way based on racial lines," explaining that gang membership was more "[t]erritorial."

Although Juror 211 indicated on her questionnaire that none of her family members had been the victim of a crime, the prosecutor asked her the same question during voir dire. Juror 211 then disclosed that her cousin had

been killed about seven years before during "random street violence," and as far as she was aware the crime had not been investigated.

Before the defense attorneys began their questioning, and outside the jurors' presence, the prosecutor asked the trial court not to strike the question about crime in families to which it had sustained an objection. The prosecutor stated, "I have asked similar questions of other individuals [who] are in gang-infested areas of our community, most notably Antioch. The individual who came from Pittsburg volunteered himself. [¶] Other individuals from Richmond, I've asked the same questions to see if they will openly answer them in a candid manner, and that was what I was attempting to do with this particular juror, and testing whether or not— certainly they can observe what is going on in what is well known as a crime-ridden community in Contra Costa."[15]

The trial court responded that the objected-to question was about whether "crimes run in families," and "some people with experience in Richmond do know [there are] certain families that have had that reputation.

---

[15] Juror 211 was part of the second group to be questioned. The only other prospective juror in her group from one of these areas, a woman from Richmond, was not questioned about the city. This juror indicated on her questionnaire that Richmond was "no longer [a] good community . . . because of drugs, killing[,] etc." A male juror from the first group who lived in Pittsburg and had also lived in Bay Point and Antioch mentioned during voir dire that one of his neighbors was affiliated with a gang and shootings regularly happened outside his house. And Juror 142, a woman from the first group who was one of the two Black jurors ultimately seated, had lived in Pinole for 17 years but lived in Richmond for 30 years earlier in life. In response to the question about how she would describe the area where she was raised, she stated, "Family oriented." During voir dire, however, she agreed with the prosecutor's statements that Richmond was "very different" than it had been, that there was more gang activity, and that "although there might be this family atmosphere, sometimes the family atmosphere[] can be criminal activity, as well."

I don't know if that's people just in the criminal justice system or people in Richmond, but I'm aware of that, and maybe you are probing that." The court stated the prosecutor was entitled "to poke a hole a little bit" in Juror 211's positive description of Richmond, which it characterized as "provok[ing] some pretty serious questions. . . . [¶] Within the press, with[] every person who talks about Richmond, from police officers who are trying to be involved, from teachers, from their political officials, that is a description [with which] I don't necessarily say that they would all agree." The court explained that it had nevertheless sustained the objection because of the question's "phrasing," which "could have been misconstrued."

Whitley's counsel, who made the objection, observed that the amount of time the prosecutor spent questioning Black jurors compared to other jurors was "extraordinarily lopsided." Counsel said, "I don't know if [the prosecutor] lives in Richmond or not, but she certainly has her opinions. The fact that [Juror 211] doesn't share those opinions is not proper [grist] for this particular voir dire mill. [¶] [The prosecutor] doesn't like what she hears, so be it. That's not a reason to excuse someone for cause. Everybody lives in all kinds of different socioeconomic areas. Just because someone is poor doesn't mean they are not happy. Just because someone is poor doesn't mean they don't have a strong family. [¶] And for her to take her prosecutorial, white-woman attitude about what this woman in her opinion should respond to her questions is totally improper."

Subsequently, the prosecutor challenged Juror 211 for cause, arguing that it appeared the juror "was being less than truthful in her answering." After noting that no other juror failed to sign the questionnaire under penalty of perjury, the prosecutor observed that when the trial court asked Juror 211 to affirm her answers were truthful, "she actually looked down. She look[ed]

up, she paused, and then she finally answered the Court's question, 'yes.'" In addition, the prosecutor identified as her specific concern the fact that Juror 211 had indicated on the questionnaire that none of her family members had been the victim of a crime but then disclosed during voir dire that her cousin was murdered. The prosecutor stated, "[A]fter continuous prodding, eventually, she was able to say 'yes,' and it wasn't a crime as if it was a stolen vehicle or mail theft, but it's the murder of her cousin."[16]

Silas's counsel challenged the prosecutor's description of how Juror 211 responded when asked to affirm her questionnaire under penalty of perjury. Suggesting that "if there's such an issue with [the juror's] response that should have been put on the record immediately rather than four hours later," Silas's counsel stated, "I didn't see anything remotely [like] what [the prosecutor] saw as far as that goes. I don't think [Juror 211] is even a close call. I'm concerned that maybe this is being set up for a possible defense to future challenges when we get to do peremptories by making a cause challenge to an African-American juror. I don't think it's close. I'm not sure it's being done in good faith."

The other defense attorneys also expressed concern that the prosecutor's challenge was racially motivated, with Whitley's counsel observing that "[i]t's so blatant what is occurring here." Among the circumstances noted were that another, non-Black juror failed to disclose on her questionnaire that her son witnessed a crime, but the prosecutor did not mention this in challenging that juror for cause; that the prosecutor spent approximately a third of her time for voir dire questioning Juror 211, whom

---

[16] It is unclear what "continuous prodding" the prosecutor referred to, as the first and only time the prosecutor asked whether a family member had been the victim of a crime, Juror 211 immediately answered, "Yes."

25

Chaney's counsel described as "bright, responsive, friendly[,] and . . . not . . . evasive at all"; and that the prosecutor "spent no time whatsoever" questioning the non-Black juror in Juror 211's group who also lived in Richmond about her views or whether "she . . . had relatives in the whole thing," and "the only other juror [who] was asked anything about Richmond was another African American in our panel yesterday" (Juror 142).

The trial court denied the challenge for cause. In doing so, however, the court disagreed with defense counsel that it was "not close," stating, "I had issues with this juror as far as just her competency, her willingness to serve as an unbiased juror. First, coming in over a half an hour late. I understand her explanation. The lack of the signature on the questionnaire and some of her responses on the questionnaire seemed to be problematic. So, on the other hand, she consistently said she could be fair. [¶] And although it's neither here nor there, but I see [a] clear peremptory challenge. She does seem to be very defense-oriented in her responses, as well as her questionnaire."

Silas's counsel asked the trial court to clarify its statement that Juror 211 was "defense-oriented," and the court responded that Juror 211 had been "very animated in her body language that she would be vigilant in presuming the police don't do their jobs and came off incredibly defense-oriented" in her written and oral responses as well. Silas's counsel then asked that observations of jurors' body language be put on the record as they occurred, because peremptory challenges would not be done for another month. The court stated it was keeping "thorough notes during this process," including about body language, to help it comply with *Batson/Wheeler*.

Although the prosecutor said she was not obligated to put her observations about jurors on the record, she nevertheless responded to

defense counsel's "claims of disparate questioning." Initially, she inaccurately noted that "no defense attorney asked questions of [Juror 211]."[17] She then stated that the other Black juror questioned about Richmond, Juror 142, was from Pinole but had indicated familiarity with Richmond, "[s]o there hasn't been disparate questioning amongst individuals of those particular areas." The prosecutor concluded by objecting to "these defense attorneys . . . spouting off to their clients about how [she is] a racist," saying it was "a violation of [the] Business and Profession[s] Code."

The following day, the trial court offered several remarks about the "kind of heated battle . . . we descended into yesterday evening . . . [about] race and the topic of race relations, of how in particular African-Americans are treated in our country by the police and by others." The court emphasized that it was doing its best to be "fair" and "evenhanded," and it took responsibility for not intervening quickly enough when the dialogue between the attorneys became hostile. The court admonished Whitley's counsel for his comments about the prosecutor, calling them "unfair, inappropriate[,] and unprofessional," and directed the attorneys to make a record of their concerns instead of "attacking the person who is doing it."

Michaels's counsel asked to make a record of his objections to the questioning of Juror 211. He said, "[W]hat I understood the prosecutor to say is that [the juror's] response about her views of Richmond, that she described it as hopeful, that there are educational opportunities, and that people were being uplifted, that [the prosecutor] took that as a sign that this woman was disingenuous and not forthright in her questionnaire. [¶] That concerned me

---

[17] Two defense attorneys immediately objected to this statement as untrue. In fact, Silas's counsel and Chaney's counsel also questioned Juror 211.

27

enough, but . . . I took the Court's comments to be sort of validating that view of Richmond." Counsel noted that he had grown up in Richmond, and he observed that several positive changes had occurred, including a substantial decrease in the crime rate and progressive policies to benefit the community economically. The trial court responded that it thought "it was an appropriate area for [the prosecutor] to make inquiry" given "other countervailing, . . . commonly held perceptions of Richmond," but agreed there had been positive developments and that the city's general reputation "perhaps is no longer deserved."

The prosecutor subsequently questioned another juror, a white woman who had lived in Antioch for over 30 years and ultimately sat on the jury, about the city's changes over time. The prosecutor asked, "Over that time that you've stayed there, have you seen at least the criminal area of Antioch change over the period of time of 32 years?" The juror answered affirmatively, and when the prosecutor asked how the city had changed, the juror responded, "Just the activity that goes on in the neighborhoods that used to be much nicer. The writing on the streets, the corners, the markings, the litter. It's just minor things to major things." The prosecutor did not question the juror further about this topic.

Outside the jurors' presence, Whitley's counsel objected to this questioning on relevance grounds. Stating that she was testing the jurors' "ability to perceive what is around them" as relevant to circumstantial evidence, the prosecutor explained:

> "There's certain hotbeds of criminal activity in our county. I happen to know them because of gang crimes here within Contra Costa, and Antioch is one of them. That's become infested with certain areas.

"Obviously, we've been talking heavily about Richmond and being able to see whether or not there's observations of decline or change in crime or the fact that gangs have infiltrated certain areas.

"The same is true that I've asked for Pinole because the close connection to Richmond and in the news in that particular area. The same is true for Pittsburg for the period of 1980 through the late 1990s. I'm reviewing [the jurors'] background as to what cities they lived in and for what period of time.

"For those jurors, which there's relevancy to that, that they would have seen that decline or the [increase] of violence, I'm testing them to see if they are aware of it in their own area. I think that it goes directly to whether or not they will be [able] to pick up circumstantial evidence in this case from the witnesses, from their observations about the fact that they believe these individuals were gang members because they were constantly together. They were selling drugs together, they had similar tattoos and all of that information.

"So I do believe it's a valid test of whether or not they can actually apply circumstantial evidence, and it's one area in which I am drawing those deductions from."

The trial court overruled the objection, agreeing with the prosecutor that the questioning was relevant because it went to whether jurors could evaluate circumstantial evidence. The court cautioned the prosecutor, however, that when questioning jurors about the areas they lived in she should "tie it in and talk to them about circumstantial evidence. Actually tie it into whether or not they can be fair."

Subsequently, Michaels's counsel voiced concern that the prosecutor's reason for questioning Juror 211 on this subject was different than the prosecutor's reason for questioning the juror from Antioch. Specifically, whereas "[w]ith regard to [Juror 211] . . . , the prosecutor's reasoning for delving so deeply into her questions about Richmond [was] a belief based on

29

the answers in the questionnaire that a juror was not being forthright because she lived in an area that was by the prosecutor's determination crime-ridden," with regard to the other juror the rationale was "to test the juror's ability to perceive circumstantial information around them and then whether they can . . . deduce from that criminal activity." Chaney's counsel also expressed concern that the prosecutor's "leading questions about the terrible crime problem in Antioch" were improperly presenting negative, inadmissible evidence to the prospective jurors. Ultimately, the trial court ruled that the prosecutor could continue to ask such questions.

After several more days of voir dire, the trial court and parties returned to this issue. Whitley's counsel argued that the prosecutor's questions about crime running in families and changes in particular cities over time were "too close to the issues in this particular case," which included the conspiracy charge where "[t]he conspirators happen to be members of a family" and the prosecutor's "theory of San Francisco transplants bringing criminality and gang problems to previously tranquil communities." Counsel argued that such "questions have absolutely no relevance to any cause challenge," instead "prejudic[ing] the defendant[s'] case [by] inviting a bias to enter into the juror[s'] assessments of actual evidence" and "set[ting] the stage for a disingenuous reason for an exercise of a peremptory challenge." Although the prosecutor's "subsequent rationale for these Richmond and Antioch questions was that [they] would test the jurors' ability to follow the circumstantial evidence instruction," there were many other examples of circumstantial evidence the prosecutor could use to explore this area without resorting to an example that could bias the jurors. Whitley, joined by the other defendants, then moved to prohibit the prosecutor from asking further questions in this vein.

30

In response, the prosecutor stated she offered the rationale for asking Juror 211 about the juror's community to explain a cause challenge. On the other hand, the rationale for asking the Antioch juror similar questions was offered when "the Court's question . . . was relevancy, not a cause challenge." The prosecutor then explained that such questions were intended not just to test jurors' views of circumstantial evidence but also "to test their openness with . . . people, and in particular, asking questions about their community tend[ed] to tell [her] a lot about a person. It says whether or not they're self-aware. It says whether or not they're aware of what's in their community. It [told her] whether or not they're making rational conclusions based on that, whether or not they are piecing things together that perhaps they are watching crime go up in their neighborhood. It also help[ed] [her] test whether or not, for instance, someone might have been fully forthcoming on a particular questionnaire and [she] want[s] to delve further into that." The prosecutor concluded by stating, "[T]here's been a number of Hispanic jurors who have been through here and white jurors from Richmond and the Antioch area that I've been doing the same questioning. . . . As soon as one of them acknowledge[s] to me that there is a change in their community in those areas which I happen to know well because of my area of where I practice, that I don't question further. My assessment is done."

The trial court granted defendants' motion, ruling that the prosecutor could no longer question prospective jurors about their understanding of circumstantial evidence by focusing on changes in their neighborhoods. The court indicated that the prosecutor's questioning of Juror 211 on this topic "made sense," since that juror's view of Richmond was significantly different than the city's negative reputation, even if that reputation was no longer entirely deserved. With subsequent jurors, however, the questioning was "too

31

close to home" and amounted to "pre-trying the case." Thus, while all the parties could ask questions about areas involved in the case, they could not do so as a means of exploring circumstantial evidence.

The Contra Costa County District Attorney's Office's history of *Batson/Wheeler* violations also arose at the same hearing. The discussion included a particular prosecutor's repeated *Batson/Wheeler* violations. (See *Currie v. McDowell* (2016) 825 F.3d 603, 605–606 [granting habeas relief for prosecutor's third violation in same case].)[18] The trial court responded that although the *Currie* prosecutor might have a history of violations, the court did not find the same true "with regard to the entire D.A.'s office." The court explained that during its previous experience as a public defender in the county, "working across from numerous members of the Office of the District Attorney, [it] did not find that there was any pattern, whatsoever, of them excluding African-American jurors from their juries."

The prosecutor later exercised a peremptory challenge against Juror 211, prompting a *Batson/Wheeler* motion. The trial court began by emphasizing that it "[did] not and [had] not found [the prosecutor] to have a discriminatory purpose in her challenges, neither last trial nor this one, either for cause [or] her peremptory challenges." It also reiterated its finding that neither the prosecutor nor the Contra Costa County District Attorney's Office had "a history of [or] reputation for *Batson/Wheeler* violations."

As the trial court began to announce its ruling of no prima facie case, Chaney's counsel interjected to argue that the prosecutor's conduct during

---

[18] Chaney's counsel later cited another case, *People v. Allen* (2004) 115 Cal.App.4th 542 (*Allen*), in which Division Three of this court concluded that the trial court erred by accepting a different Contra Costa County prosecutor's "meaningless explanation" for a peremptory strike of a Black prospective juror. (*Id.* at pp. 545, 553.)

the 2014 Arnold-Chaney trial and defendants' 2015 mistrial was relevant to the determination. According to counsel, "[T]he sole African-American seated on [the Arnold-Chaney] jury was the holdout vote for not guilty on several of the significant charges. [¶] [The prosecutor] attempted quite vigorously to get that juror kicked off for alleged failure to deliberate instead of accepting that this was . . . not a meeting of the minds.[19] [¶] That context led into the trial for these four codefendants last fall wherein there were six African-Americans after hardships who made it into the process of jury questioning. [The prosecutor] used peremptory challenges on all six of the African-Americans in the main jury. Defense exhausted challenges. We then did encounter one additional African-American woman in the process of getting jurors for the alternate seats, and one African-American was seated as one of the six alternates."

Moving to the current trial, Chaney's counsel observed that the prosecutor "made 19 contested cause challenges, [10] of which were against African-Americans. Six of her challenges against African-Americans were granted and four of her challenges against African-Americans were denied. [¶] We have, over the course of the 16 groups, encountered 22 African-

_____

[19] The record supports this characterization of events at the 2014 trial, which was conducted by the same prosecutor before a different judge. After deliberations began, one of the jurors reported that she felt "intimidated" by the other jurors and pressured to change her vote. The juror explicitly tied this experience to her race, stating, "It's really hard for me to sit there and voice my opinion as an African American and be heard without feeling like I'm racist." The prosecutor argued that the juror should be replaced for misconduct because she was no longer deliberating. The trial court ultimately declined the prosecutor's request, finding that the jury's agreement on several counts showed that deliberation had occurred for a reasonable amount of time and the juror at issue "simply [did] not agree with the other jurors" on the remaining counts, which was "simply a hung jury."

American jurors [for voir dire]. . . . [¶] There were five for which there was no challenge made. There were five for which there was a stipulation for cause. There were six for whom the district attorney challenge was granted. There were four for whom the district attorney challenge was denied, two of whom later also received hardships. There was one who was ruled ineligible by the Court based on a prior felony. And then there were three that were excused for hardship."

Finally, Chaney's counsel pointed out that the previous year, in a trial of two Black defendants for murder, the prosecutor "struck or attempted to strike an African-American juror. A *Batson*[/]*Wheeler* challenge was made, and the [prosecutor's] . . . challenge was denied and the juror was reseated." Counsel offered the relevant minute order and a portion of the reporter's transcript from that trial, *People v. Cater and Burks* (Super. Ct. Contra Costa County, 2015, No. 5-131405-3) (*Cater*), and they were marked for identification.[20]

The proffered *Cater* documents show that in May 2015, the two defendants in that case brought a *Batson/Wheeler* motion after the same prosecutor sought to exercise a peremptory challenge against a Black prospective juror. The judge did not rule on whether a prima facie case had been made, instead asking the prosecutor to respond to the motion. The

---

[20] The prosecutor objected that Chaney's counsel had not provided the full transcript of the *Batson/Wheeler* challenge from *Cater*, and the trial court indicated that it wished to see a complete transcript. When later making findings on defendants' *Batson/Wheeler* motions in this case, the court indicated that it had "reread the [*Cater*] transcript several times." Although the *Cater* minute order and transcript were not included in our record, *Cater* was appealed to Division Three of this court (case no. A146678), and we procured the relevant minute order and transcript from the record in that case.

prosecutor stated she had come to believe that one of the defendants, who was in his early twenties at the time of the crimes, was going to testify. The prosecutor was worried, given the defendant's youth, about sentiments the challenged juror had expressed about her 20-year-old Black son. Specifically, the prosecutor was worried that the juror would "recognize[] that her son at any time could be in a seat where one of [the defendants] are or with the victim in this case." The prosecutor said that after "struggl[ing] long and hard," she could not conclude "with certainty that [the juror would] not rely on her visceral mother factor in connection with the defendants," and she thought there was "a chance . . . that the mother factor . . . will overcome her ability to be an impartial decider of the facts as [one of the defendants] is going to testify to them."

The *Cater* judge ruled that there was not "a sufficient nonrace-based [reason] for that particular challenge," and she found that "the challenge [was] not justified." She explained, "I believe what [the challenged juror] said was that she as a mother of a similarly aged son to the defendants could see herself in the position of either side, . . . being the mother of the victim of a crime or the mother of someone accused of a crime, and she didn't weigh that either way. [¶] . . . I think that her answers across the board were that she could follow the law, that she did not favor one side over the other, and she could see herself in either role. So I don't think there's a sufficient basis for a challenge so I'm going to deny the challenge."

Subsequently, the prosecutor asked for clarification of the ruling. After noting that the seated jury had at least three Black members, the prosecutor stated she was "at a loss" to understand why the judge had not accepted her reason for striking the challenged juror, particularly since another juror who had said it would be hard to set aside her "maternal instinct" had been

35

excused for cause. The judge responded that the juror challenged for cause had indicated she would favor the defense, whereas the challenged juror had noted that her feelings "could put her in either camp." Addressing the prosecutor, the judge also stated, "[M]y findings don't necessarily equate to misconduct on your part. I have to evaluate whether or not that particular challenge was race neutral. I thought that based on your explanation compared to her answers, it didn't reach the criteria that is necessary."

The trial court here stated that after hearing what Chaney's counsel had to say, its "comments still [held] with regard to what [it was] aware of with regard to [the prosecutor]" and "with regard to the [District Attorney's] office." It then stated that, even assuming the prosecutor had made an improperly "race-based challenge" in the trial before the other judge, it "still [did] not find a prima facie case with this particular Juror 211." The court offered the prosecutor a chance to "supplement the record," and the prosecutor stated she might do so at the end of jury selection. The prosecutor did, however, note that she was "adopting what was [her] cause challenge basis behind Juror 211."

At a subsequent hearing, the prosecutor reiterated the bases of her challenge for cause to Juror 211, which were the juror's "hesitation" to affirm the answers to her questionnaire under penalty of perjury and her failure to disclose until voir dire that her cousin was murdered. The prosecutor also returned to the juror's statement in her questionnaire "that Richmond is a family-oriented community of hope with love and many opportunities. No matter what these [defense] attorneys want to say, the unfortunate truth is Richmond is often a trap to those who are socioeconomically deprived. It's not a community of hope. It's a community of murder." The prosecutor also commented on the juror's questionnaire answers indicating that "[s]he's

36

never known anyone arrested or investigated although she has a lifelong time in Richmond."[21] The prosecutor said, "I simply can't see this as possible given the amount of crime that comes from there. Me knowing it because, in fact, that is what I've dedicated my career to."[22]

The prosecutor offered numerous other reasons for the peremptory challenge as well. Juror 211 had "circled 'strong' multiple times" on her questionnaire, which made the prosecutor question whether the juror could apply the concept of reasonable doubt. The prosecutor had also seen the juror

---

[21] In fact, the questions at issue asked whether jurors themselves, a family member, or a person "close to [them]" had been arrested or investigated for a crime, not whether the jurors knew *anyone* who had been.

[22] At the outset of this hearing, the prosecutor gave a speech defending herself from the defense's accusations that she was a "racist," "affluent white prosecutor." To give the trial court and "an appellate court . . . some background to make some decisions about [her] use of peremptory challenges," the prosecutor explained, "I am, in fact, not an affluent white prosecutor. I was born and raised in one of the poorest parts of Fresno. . . . My mother was a teacher . . . in the lowest socioeconomic portion of Fresno. It was almost 98 percent Black. [¶] My parents decided to collect their money to be able to give these young men and women experiences. And from the time that I was about three to the time that I was ten, . . . these Black high schoolers . . . became the individuals who babysat me, who[m] my mom basically took under her wing to be able to afford them and give them opportunities in life."

The prosecutor also noted that she had "dedicated the majority of [her] career to Black-on-Black crime." She stated, "And what is abundantly lost on these [defense] lawyers . . . is that in the back of my mind and when I return to my office every day, I have the picture of two young African-Americans who were taken away. Not only do I have them sitting there, but I deal daily with the fact that the key eyewitness in this case is a young African-American lady. I have to deal with the families of two Black individuals who were taken from us, daily. [¶] I work 16 hours a day. I don't get paid one shred more by choosing to put in this additional time. And I do it because there is a complete violence that is out of control that is taking young African-Americans from us."

"roll[] her eyes" at two other potential jurors.  Relatedly, the juror had written on her questionnaire "that she wanted to watch law enforcement to make sure that they were doing their job ethically, obviously overly scrutinizing law enforcement even though she claim[ed] to have had no issues with them."  Finally, according to the prosecutor, the juror "seemed almost overly eager to be here, to turn to each of us and to respond to us and to nod her head.  Quite frankly, I think she was getting on this jury to be able to skew the verdict."

The trial court did not address individually the prosecutor's proffered reasons for striking Juror 211.  Instead, as discussed in more detail above, the court later agreed that both Juror 211 and Juror 275 "had a myriad of anti-prosecution issues" the prosecutor had identified, meaning the cause challenges for both jurors were close.

      3.     Juror 313

Juror 313 was a 51-year-old Black woman who was examined after Jurors 211 and 275.  She had a B.A. in Pan-African studies and owned an executive recruitment service.  She had lived in Richmond for over 30 years.  She wrote on her questionnaire, "I describe Richmond as a small town in a good location (easy access to other Bay Area locations).  I think of it as a lovely community with many good people.  I've also been told that it is/was the murder capital of the state.  That has not been my experience."

Juror 313 specified that she had lived in "unincorporated East Richmond Heights" for her entire time in Richmond.  Referring to the statement of another juror in Juror 313's group, who had lived in Richmond for over 50 years, that the city had "gone downhill," the prosecutor asked Juror 313 whether she thought "there has been this flux of criminal activity or . . . [it had] stayed the same."  Juror 313 responded, "I think, based on

38

what I've been told and what I've heard, that there has been a change. Personal experience, it's been exactly the same."

The prosecutor also asked Juror 313 about her ability "to take a look at patterns of particular individuals, maybe clothing they were wearing or colors they had or certain tattoos that seemed to repeat," to determine "what, if anything, the significance of that repeat pattern is." The juror said she would be able to do this. The prosecutor then asked whether the juror had, "anywhere in Richmond, observed these particular repeat patterns, maybe even just passing through for your work." After clarifying that the prosecutor was referring to "tagging and stuff," the juror responded that she had not noticed patterns and agreed she was "just not looking for them."

Juror 313 also indicated on her questionnaire that she was on a jury that reached a verdict in a DUI case around 1985. During voir dire, Silas's counsel questioned her about that experience. Although counsel stated he did not want to know what the verdict was, the juror's responses established that the jury had returned a verdict of not guilty. She said, "Well, so we looked at the evidence and even though we believed one thing was true, we had to come back with a verdict that didn't speak to that." After stating that the outcome would have been different if the evidence "had been handled appropriately," Juror 313 elaborated, "[T]hey had the blood, took the blood, and they didn't test it for two years. And then they brought this scientist in and said this is what can happen to blood [¶] . . . [¶] if it's not tested for alcohol for two years." Though the defendant had "said he lost count after [10] drinks," the jurors "would have been speculating that his blood alcohol was a certain level, but [they] didn't have that evidence so [they] couldn't convict on that."

39

The prosecutor exercised a peremptory challenge against Juror 313, and the defense made a *Batson/Wheeler* motion. The trial court found that a prima facie case of discrimination was established. The prosecutor responded that she had excused Juror 313 "because she was in a not guilty DUI verdict based on the fact that, quote: The blood [sample] was not tested for two years. Even though we all knew one thing, we returned the opposite verdict. [¶] And then went on to say that the person had admitted [he] had [10] drinks but that would be speculation. This juror does not understand circumstantial evidence. And based on her not guilty verdict biting on a commonly used DUI defense, which is essentially fabricated, that's my basis for excusing her."

The trial court stated it was "struggling with this challenge." The court noted that the defense had brought *Batson/Wheeler* motions when "jurors who clearly have extreme prosecution issues and should be challenged by the People have been," and the court saw the fact Juror 313 had "come back with a not guilty verdict in a prior jury trial" as "a prosecution problem." On the other hand, Juror 313 was "unique" in this respect, making a comparative analysis difficult.

The trial court ultimately "found [the prosecutor] to be credible." After noting that a juror's vote for acquittal in a prior case "is a valid race-neutral reason to strike" and "made the prosecutor's peremptory challenge almost a foregone conclusion," the court stated that its comparative analysis did not reveal any other jurors the prosecutor had passed who had suggested they had also voted to acquit in a previous trial.

Even though the trial court had already found credible the prosecutor's reasons for striking Juror 313, the prosecutor offered additional reasons for the strike at the subsequent hearing where the peremptory challenges to

40

Jurors 211 and 275 were also discussed. The prosecutor observed that although Juror 313 acknowledged hearing that "Richmond was the murder capital," the juror stated "that was not her experience." Drawing a comparison to Juror 211, the prosecutor observed that Juror 313 was likewise "an individual who either chooses not to accept reality or chooses not to see what's around her. She was oblivious to the circumstantial evidence in her community of graffiti, of colors of . . . jerseys or tattoos, the heart of the gang evidence which [the jurors] are going to be asked to consider here in this trial." These circumstances, in combination with the juror's statements about her previous jury service, led the prosecutor to conclude that the juror did not understand circumstantial evidence.

The trial court reiterated that it found the prosecutor was "credible in giving a race-neutral reason for the peremptory challenge" and, therefore, "the defendants ha[d] not shown purposeful race discrimination." The court also made specific findings that the prosecutor did not "spen[d] an inordinate amount of time" questioning Black jurors as compared to jurors of other races and that there was insufficient evidence "to conclude that the Contra Costa County Office of the District Attorney has a reputation or extensive history of juror strikes in violation of *Batson*[/]*Wheeler*." Finally, the court stated the peremptory challenge of Juror 313 "would likely not have given rise to a prima facie case" if not for the information the defense provided about *Cater* and *Allen*.

### C.    *The Steps in Our Review*

The approach to reviewing a *Batson/Wheeler* claim on appeal depends upon the rulings below. "[A]n appellate court properly reviews the first-stage ruling if the trial court has determined that no prima facie case of discrimination exists, then allows or invites the prosecutor to state reasons

41

for excusing the juror, but refrains from ruling on the validity of those reasons." (*Scott*, *supra*, 61 Cal.4th at p. 386.) Likewise, if the trial court finds no prima facie case of discrimination, the prosecutor has an opportunity to provide nondiscriminatory reasons for the peremptory challenge, and the trial court determines that those reasons are genuine, "an appellate court should begin its analysis . . . with a review of the first-stage ruling," proceeding to review the third-stage ruling only if it disagrees with the trial court's finding of no prima facie case. (*Id.* at p. 391.) If the trial court finds that a prima facie case exists, makes no first-stage ruling, or finds no prima facie case only after the prosecutor offers reasons for exercising the challenge, review is of the third-stage ruling. (See *id.* at pp. 387, fn. 1, 392.)

*Scott* identified certain circumstances in which this general approach is altered, two of which are potentially relevant here. First, if "(1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state . . . reasons for excusing the juror on the record, (3) the prosecutor provides a reason that is discriminatory on its face, and (4) the trial court nonetheless finds no purposeful discrimination, the appellate court [still] begin[s] its analysis . . . with a review of the first-stage ruling. In that (likely rare) situation, though, the relevant circumstances, including the facially discriminatory justification advanced by the prosecutor, would almost certainly raise an inference of discrimination and therefore trigger review of the [third-stage ruling]." (*Scott*, *supra*, 61 Cal.4th at pp. 391–392.)

Second, there is "an additional wrinkle when the appeal involves multiple *Batson/Wheeler* challenges. Where the appellate court is already evaluating the sincerity of the proffered reason for excusing one juror as part of its review of all the evidence as it bears on the question whether the

excusal of *another* juror constituted unlawful discrimination [citations], the appellate court may likewise begin its review . . . as to the first juror by evaluating the sincerity of the proffered reason." (*Scott*, *supra*, 61 Cal.4th at p. 392.) In other words, where the trial court has found that a prima facie case exists as to at least one challenged juror, requiring review of the trial court's third-stage ruling, the appellate court can skip directly to determine whether purposeful discrimination was proven as to any juror for whom the trial court found there was *not* a prima facie case.

Here, the trial court purported to make only a first-stage ruling as to Juror 275, and it did so before the prosecutor put on the record her reasons for the peremptory challenge. But the prosecutor previously relied on some of the reasons offered for the peremptory challenge in challenging this juror for cause, and the court credited some of them even though it did not expressly rule that defendants failed to prove purposeful discrimination at the third stage. Specifically, the prosecutor's reasons for the peremptory challenge were that Juror 275 was "openly hostile" when questioned about Black Lives Matter, refused to admit that "there is a contingent within [the movement] which destroys property or . . . riots," had a negative opinion of law enforcement, did not nod when asked if she would treat law enforcement witnesses like other witnesses, arrived late, and "wanted absolutely nothing to do with this case."[23]

---

[23] The prosecutor also mentioned Juror 275's previous job as a security guard when listing the reasons for the peremptory challenge, stating, "She was a former security guard in a hospital and a refinery, and the defense claims that that's law enforcement. I wish they could see my caseload and see the number of security officers that I have pending on murder trial." In our view, the prosecutor was responding to the defense's claim that Juror 275 had a law-enforcement background, not stating that the juror's prior job was a separate reason for exercising the strike.

Of these reasons, the prosecutor had previously relied on reasons related to Black Lives Matter in making the challenge for cause, and in ruling on the earlier challenge the trial court had agreed that Juror 275 did not click with the prosecutor. The court had also agreed that the juror was reluctant to be there. Moreover, the court explicitly tied its finding of no prima facie case to how "extremely close" it came to granting the prosecutor's challenge for cause, and it found that the juror had "a myriad of anti-prosecution issues" as "vocalized by [the prosecutor] and . . . observed [by the court] during the cause challenge as well as today," i.e., the day the peremptory challenge was made. Thus, the court arguably credited most of the reasons the prosecutor offered to justify both challenges to Juror 275, effectively finding that the peremptory challenge was not exercised with discriminatory purpose. In short, we conclude that the court made both a first-stage finding and a third-stage finding, even though we derive the latter from the court's ruling on the challenge for cause.

In their original briefing, the parties disagreed about which stages of review are implicated here. The Attorney General argued that we should conduct a first-stage review of the rulings as to Jurors 211 and 275 and a third-stage review of the ruling as to Juror 313. Defendants argued that the prosecutor's justifications for striking all three jurors were "so charged with race that [they] fail to clear even the low hurdle of *Batson*'s second step," a claim that amici curiae joined with regard to Juror 275.[24] Defendants also urged that, since we must conduct a third-stage review of the ruling as to

---

[24] The Roderick and Solange MacArthur Justice Center, American Civil Liberties Union, American Civil Liberties Union of Northern California, Office of the State Public Defender, California Attorneys for Criminal Justice, and Lawyers' Committee for Civil Rights of the San Francisco Bay Area were granted leave to file a brief on behalf of defendants.

Juror 313, review of the challenges involving the other two jurors "may begin with the third stage."[25]

We are not persuaded by defendants' arguments on this point. First, assuming that we were otherwise required to conduct a first-stage review of the ruling on Juror 275, the fact that the prosecutor "provide[d] a reason [for the peremptory challenge] that is discriminatory on its face" would not justify skipping to the third stage, even though it would likely lead to a third-stage review as well. (*Scott, supra*, 61 Cal.4th at pp. 391–392.) Second, because we need not evaluate the denial of the motion as to Juror 313 to determine that reversal is required, it would be illogical to rely on *Scott*'s "additional wrinkle" to skip to a third-stage review of the claim involving Juror 275 merely because there happened to be a third-stage ruling on Juror 313. (*Id.* at p. 392.)

Accordingly, we start by reviewing the trial court's finding at the first stage that defendants failed to raise an inference of discrimination in the striking of Juror 275. Because we conclude that the trial court erred, we next address whether the prosecutor's reasons for the peremptory challenge were facially race-neutral. Because we conclude these reasons were technically neutral, we finally address whether the court erred in crediting them. We conclude that it did, as its determination that defendants failed to show

---

[25] At our request, the parties submitted supplemental briefing on whether any of the trial court's comments could be construed as a third-stage ruling on Juror 275. The Attorney General agreed that it would be appropriate to conclude the trial court made a third-stage finding based on its crediting of the prosecutor's reasons for challenging the juror for cause. And although defendants apparently misunderstood our question to be whether the court's first-stage ruling could be affirmed based on the prosecutor's reasons for challenging Juror 275 for cause, to which we agree the answer is no (see *Scott, supra*, 61 Cal.4th at p. 390), their main briefing clearly contemplated the possibility of conducting a third-stage review.

discrimination by a preponderance of the evidence "was unreasonable in light of the record of voir dire proceedings." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1172.)

> D. *The Trial Court Erred by Finding No Prima Facie Case of Discrimination in the Striking of Juror 275.*

> 1. The standard of review

We begin by addressing the standard of review applicable to a trial court's first-stage ruling, a subject that lacks clarity in the case law. The lack of clarity stems from *Johnson*, in which the United States Supreme Court held that California courts had been applying too onerous a standard to evaluate whether a prima facie case of discrimination was established. (*Johnson*, *supra*, 545 U.S. at p. 168.) Before *Johnson*, California "require[d] at step one that 'the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias,' " or, in other words, that there was a " 'strong likelihood' " a given challenge was improperly motivated. (*Id.* at pp. 166, 168.) *Johnson* rejected the " 'more likely than not' standard [as being] at odds with the prima facie inquiry mandated by *Batson*," under which a defendant must produce only enough evidence to permit a trial court to draw a " 'reasonable inference' " of discrimination. (*Id.* at pp. 166, 170, 173.) Observing that the trial judge had stated the first-stage issue was "close" and our state Supreme Court had called the prosecutor's pattern of strikes "suspicious," *Johnson* concluded, "Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under *Batson*." (*Id.* at p. 173.)

Before *Johnson*, our state Supreme Court had unambiguously held that a first-stage ruling was reviewed for substantial evidence. (*People v. Alvarez* (1996) 14 Cal.4th 155, 196–197; accord *Silva*, *supra*, 25 Cal.4th at p. 384.)

The Court explained that although the ultimate ruling on a *Batson/Wheeler* motion "broadly resolves a predominantly factual mixed law-fact question, as a general matter, at least, it narrowly depends on the answer to a purely factual question, viz., whether the prosecutor acted with the prohibited intent—which in turn typically depends on the answer to another purely factual question, viz., whether the prosecutor's customary denial of such intent is true [citations].  It follows that the determinations underlying a ruling of this sort, that is, whether the defendant bore [the] burden of a prima facie showing of the presence of purposeful discrimination and, if [the defendant] succeeded, whether the prosecutor bore [the] consequent burden of a showing of its absence, are themselves examined for substantial evidence:  they are each reducible to an answer to a purely factual question, as identified above." (*Alvarez*, at pp. 196–197.)

Once *Johnson* was decided, California appellate courts faced the task of reviewing pre-2005 first-stage rulings where it was "unclear" whether the trial court "applied the correct 'reasonable inference' standard rather than the 'strong likelihood' standard." (*People v. Bonilla* (2007) 41 Cal.4th 313, 342.)  A few months after *Johnson* issued, our state Supreme Court addressed a defendant's claim that reversal was required because the trial court had applied the incorrect, pre-*Johnson* standard.  (*People v. Cornwell* (2005) 37 Cal.4th 50, 72–73, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  *Cornwell* explained, "Regardless of the standard employed by the trial court, and even assuming without deciding that the trial court's decision is not entitled to deference, we have reviewed the record and, like the United States Supreme Court in *Johnson*, . . . are able to apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror

on the basis of race." (*Cornwell*, at p. 73.) For the most part, post-*Johnson* decisions by our state Supreme Court have applied de novo review to first-stage rulings made before *Johnson*, either referring to *Cornwell*'s rationale that it is a legal question whether the record supports an inference of discrimination or simply stating that the independent standard of review applies. (E.g., *People v. Clark* (2016) 63 Cal.4th 522, 566–567; *People v. Montes* (2014) 58 Cal.4th 809, 854; *People v. Hartsch* (2010) 49 Cal.4th 472, 487.)

Notwithstanding its post-*Johnson* decisions, our state Supreme Court recently stated that a first-stage ruling is reviewed for substantial evidence. (*People v. Battle* (2021) 11 Cal.5th 749, 772, citing *People v. Bonilla, supra,* 41 Cal.4th at p. 341.)[26] While the Supreme Court has characterized the applicable standard in different ways, we will follow its most recent pronouncement in *Battle* and apply the substantial-evidence standard to the ruling here. Since this standard is more deferential to the trial court, our conclusion that the court's first-stage ruling cannot be sustained would not change if we applied the de novo standard.

> 2. Insufficient evidence supports the trial court's first-stage ruling.

Whether a defendant has established a prima facie case by demonstrating that the totality of the relevant facts gives rise to an inference of discriminatory purpose generally "depends on consideration of the entire record of voir dire as of the time the motion was made." (*Scott, supra,*

---

[26] The majority of federal circuit courts, including the Ninth Circuit Court of Appeals, have held that a trial court's first-stage *Batson* ruling is reviewed for clear error (*Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 684–685 [collecting cases]), the federal standard of review that applies to findings of fact. (*Escobar v. Flores* (2010) 183 Cal.App.4th 737, 748.)

61 Cal.4th at p. 384.) Although we look at the full record, "certain types of evidence may prove particularly relevant. [Citation.] Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong." (*Ibid.*)

"A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Scott*, *supra*, 61 Cal.4th at p. 384.) This principle does not authorize us to "rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination. . . . [T]he fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*Id.* at p. 390.) We may, however, rely on the prosecutor's stated reasons to "bolster" a prima facie case: "A proffered justification that is facially discriminatory must be weighed with the totality of the relevant facts to determine whether they give rise to an inference of discriminatory purpose and thus compel analysis of the subsequent steps in the *Batson/Wheeler* framework." (*Id.* at pp. 390–391.)

Here, the record contains a number of circumstances that give rise to an inference of discriminatory purpose. To begin with, the way the prosecutor questioned Juror 275 about Black Lives Matter was not neutral and suggested an antipathy toward the movement. As amici detail at length, and the Attorney General agrees, the prosecutor's questions about Black Lives Matter rested on misperceptions or biases. The movement is "based on

49

the premise that Black lives have worth and therefore must be protected and allowed to thrive." It has "engaged in and supported acts of protest and civil disobedience" as a means to bring attention to threats to Black lives, particularly police brutality. Property destruction, jury nullification, and other illegal behavior are not "tactic[s] embraced by the broader movement." Rather, "[t]he nonviolent direct action and civil disobedience tactics employed by Black Lives Matter reflect centuries-old traditions of Black civil rights protest," which have likewise been "falsely portray[ed]" as "lawless." The Attorney General "recognizes that the prosecutor's questions to [Juror 275] about [Black Lives Matter] were insensitive, to say the least, and were inaccurate and inflammatory to the extent they linked the [Black Lives Matter] movement to rioting and property destruction." The possibility of a discriminatory purpose is compounded because, after engaging in this biased questioning, the prosecutor used Juror 275's understandable negative reaction to it as an alleged race-neutral reason for challenging the juror.

In addition, the prosecutor grounded her challenge for cause on a claim that was not supported in the record. The prosecutor claimed that Juror 275 denied that some people cause property damage during Black Lives Matter demonstrations. But, in fact, Juror 275 never denied this. The exchange about Black Lives Matter shows that Juror 275 first thought the prosecutor was asking if she agreed with property destruction, not if she agreed that some people affiliated with the movement destroyed property. The juror immediately clarified the prosecutor's intended question and explicitly agreed that property destruction had "happened" during demonstrations. When the prosecutor again asked whether the juror "agree[d] or disagree[d] with that type of behavior," the juror reaffirmed that she did not "agree with people destroying other[s'] property."

Thus, the prosecutor's insistence that Juror 275 had denied property destruction was simply inaccurate, which the trial court recognized in denying the challenge for cause. It observed, "[Juror 275's] comments with regard to Black Lives Matter, she did not—she said, 'I don't agree with the property destruction.' So it's not as though she is stating that she supports the actions that have been taken by some followers of the movement."

These reasons related to Black Lives Matter for striking Juror 275 were plainly tied to race, and in particular to the prosecutor's negative preconceptions of the movement. Even if these reasons were not "facially discriminatory" such that they "almost certainly raise an inference of discrimination" (*Scott, supra,* 61 Cal.4th at p. 392), they were sufficiently race-related to "bolster" an inference of discriminatory intent (*id.* at p. 390).

Separate from the evidence directly related to Juror 275, other circumstances also bolster an inference of discriminatory purpose. In the 2015 trial of the three male defendants and retrial of Chaney—which was initiated shortly after the Arnold-Chaney trial ended when the only Black juror voted to acquit Chaney on most counts—the prosecutor exercised peremptory challenges against numerous Black jurors, resulting in no Black members on the main jury. During the proceedings here, the trial court said it was "on the fence or uncertain" about its denial of the *Batson/Wheeler* motion as to one of the jurors in 2015.

The trial court in the proceedings at issue ultimately adhered to its finding that the prosecutor did not violate *Batson/Wheeler* in the 2015 jury selection process. But it erroneously believed it was free to disregard that process. Governing law is clear that *all* relevant circumstances should be considered when determining whether a prima facie case of discrimination is established, and in retrospect some facts may take on significance that they

did not have at the time.  Thus, the court was incorrect in saying that, even if it "had found a *Batson/Wheeler* violation in the first jury selection," its "task [was] to give [the prosecutor] a fresh start as to what she has done specifically in this selection process."  Prosecutors are *not* entitled to "a fresh start" when it comes to deciding whether they have acted with a discriminatory purpose in exercising peremptory challenges.

Moreover, there was evidence that the Contra Costa County District Attorney's Office in general, and this prosecutor in particular, had in the past exercised peremptory challenges on the basis of race.  Specifically, a *Batson/Wheeler* motion was granted against the prosecutor in *Cater*, and appellate courts had found that at least two other Contra Costa County district attorneys purposely discriminated in jury selection.  We recognize that the trial court found that the District Attorney's Office did not have a history of discrimination and the prosecutor did not violate *Batson/Wheeler* in the 2015 jury selection, indicating it did not find all of this evidence suggestive of discriminatory intent.  But the court also explicitly cited *Allen* and *Cater* as essential to its finding of a prima facie case with regard to Juror 313, both undercutting its statements about the District Attorney's Office's history and recognizing the prosecutor's own history weighed in favor of an inference of discrimination.

Despite all of the circumstances that support an inference of discriminatory intent, the Attorney General argues that the trial court's finding of no prima facie case was based on nondiscriminatory reasons "that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias" under *Scott*, *supra*, 61 Cal.4th at p. 384.  We disagree.

52

The trial court justified its first-stage ruling by mentioning how close it had come to granting the challenge for cause given Juror 275's "myriad of anti-prosecution issues" as observed by both it and the prosecutor. We cannot agree that these professed issues sufficiently dispelled an inference of discriminatory intent. First, Juror 275's failure to nod her head when the trial court questioned her group about following court instructions regarding witnesses' testimony did not establish a solid reason for the prosecutor to strike her. The question to the group was not focused, as the court later assumed to the contrary, on law enforcement testimony. Instead, the question was whether jurors could generally "follow [the court's] instruction with regard to evaluation of witness testimony." Before asking the question, the court explained the need to evaluate witness credibility for almost two pages of the reporter's transcript, discussing not just police officers but also expert witnesses as examples. Thus, the failure to nod did not indicate a reluctance on Juror 275's part to follow instructions regarding law enforcement testimony in particular. Moreover, when later questioned about not nodding, Juror 275 specifically denied that she had "a concern . . . about police officers should they testify" and agreed she would "treat [such] testimony as [she] would anybody else's testimony." While a juror's hesitation to evaluate law enforcement testimony the same way as other testimony might in many situations dispel an inference that a challenge to that juror was discriminatory, the record here does not reflect that Juror 275 actually demonstrated such hesitation.

Nor did Juror 275's other responses to questions about law enforcement officials evince a bias against them or give rise to a legitimate nondiscriminatory reason to strike the juror. In making the challenge for cause, the prosecutor faulted Juror 275 for her supposed failure to volunteer

53

"further clarification as to what . . . her particular views were about law enforcement" until "she finally did offer up that there [were] issues about punishment." But Juror 275's view that Black defendants tend to be sentenced more harshly does not reflect any attitude about law enforcement. Instead, it reflects an attitude about the legal process and courts. Nor do we think that striking a juror for holding such an explicitly race-tied view constitutes a nondiscriminatory reason that necessarily dispels an inference of bias.

To the extent Juror 275 had a negative response to the prosecutor's race-related questions, the response was insufficient to defeat a prima facie case of discrimination. Any such response was in reaction to questioning that was, as the Attorney General recognizes, "inaccurate and inflammatory." We realize that the trial court said Juror 275 "did not respond well to [the prosecutor] the entire time [the prosecutor] questioned her." But the court also stated that the juror did not "warm up" to the court either, and it suggested that the prosecutor's questioning about Black Lives Matter was somewhat abrupt and inflammatory, both observations tending to conflict with the conclusion that Juror 275 had it out for the prosecutor from the beginning. Ultimately, under these circumstances any general antipathy that Juror 275 may have had toward the prosecutor is not sufficiently established by the record so as to dispel an inference of discrimination.

Finally, we address the fact that the seated jury had two Black members, whom the prosecutor had already passed when she made a peremptory challenge to Juror 275. "Although the passing of certain jurors may be an indication of the prosecutor's good faith in exercising . . . peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection, it is not a *conclusive* factor. [¶] . . . ' "If the

54

presence on the jury of members of the cognizable group in question is evidence of intent not to discriminate, then any attorney can avoid the appearance of systematic exclusion by simply passing the jury while a member of the cognizable group that [the prosecutor] wants to exclude is still on the panel.  This ignores the fact that other members of the group may have been excluded for improper, racially motivated reasons." ' "  (*People v. Snow* (1987) 44 Cal.3d 216, 225.)  If defendants' prima facie showing rested primarily on the numbers, we might find this factor more compelling, but under the totality of the circumstances the fact that the jury ultimately had two Black members provides no assurance that the prosecutor did not act with discriminatory intent by challenging Juror 275.

In short, the record simply does not support the trial court's view that Juror 275 had "a myriad of anti-prosecution issues" justifying a peremptory challenge.  Given the prosecutor's inappropriate questioning about Black Lives Matter, the absence of any clear and legitimate nondiscriminatory reasons for striking Juror 275, and the evidence of at least some historical discrimination by the prosecutor and other district attorneys in her office, the court's finding that defendants failed to establish a prima facie case of discrimination lacked substantial evidence.

> E. *The Prosecutor's Reasons for Striking Juror 275 Relating to Black Lives Matter Met the Low Bar of Facial Neutrality.*

As we have said, at *Batson/Wheeler*'s second stage, the prosecutor must offer an explanation for the peremptory strike that is "facially neutral." (*Gutierrez, supra*, 2 Cal.5th at p. 1168.)  Defendants and amici argue that support for Black Lives Matter is not a race-neutral reason for striking a

prospective juror.[27]  The Attorney General agrees "in principle" but claims that Juror 275's support for Black Lives Matter "was not the reason that the prosecutor dismissed her."  Rather, he claims that the prosecutor dismissed the juror because of "the entirety of her interaction with the court, the prosecutor, and defense counsel before and after voir dire."

While we agree that the prosecutor offered some race-neutral reasons for striking Juror 275, we must still evaluate whether the reasons related to Black Lives Matter were facially valid.  In *People v. Douglas* (2018) 22 Cal.App.5th 1162 (*Douglas*), the Third District Court of Appeal addressed the appropriate remedy where a prosecutor offered some valid reasons for challenging two openly gay jurors but offered another that was facially discriminatory, because it was based on the assumption the jurors would be biased toward the closeted gay victim.  (*Id.* at pp. 1170–1172.)  *Douglas* identified three possible approaches:  the per se approach, which requires reversal "when a party offers multiple rationales for a peremptory strike, only some of which are permissible," because of "the taint from the impermissible reason(s)"; the mixed motive approach, which permits a party who offers a discriminatory reason for a strike " 'to avoid liability by showing that the same action would have been taken in the absence of the improper motivation that the claimant has proven' "; and the substantial motivating factor approach, under which "if a bad reason is given, it can be ignored so long as the prosecutor's motivation is not substantially driven by it."  (*Id.* at p. 1173.)

---

[27] At oral argument, amici suggested that Black Lives Matter is generally an inappropriate topic for voir dire because of its racial implications.  We need not and do not resolve that issue here.

After explaining that neither the United States nor California Supreme Court has addressed the appropriate analysis, *Douglas* adopted the per se approach, holding that "[w]hen a party exercises a peremptory challenge against a prospective juror for an invidious reason, the fact that the party may also have had one or more legitimate reasons for challenging that juror does not eliminate the taint to the process." (*Douglas*, *supra*, 22 Cal.App.5th at pp. 1164–1165, 1172, 1175–1176; see *Foster*, *supra*, 578 U.S. 1023, 136 S.Ct. at p. 1754.)[28] We find persuasive *Douglas*'s reasoning and agree that the per se approach should apply when some of a prosecutor's reasons for a strike are discriminatory and some are not. (See *Douglas*, at pp. 1173–1176.) Accordingly, even though the prosecutor here offered some neutral reasons for challenging Juror 275, we must decide whether the reasons related to Black Lives Matter were facially valid.

We agree with the Attorney General that the prosecutor did not say, in so many words, that she was challenging Juror 275 merely because of the juror's support for Black Lives Matter. Rather, it was Juror 275's *reactions* to questions about the movement that the prosecutor found objectionable. Specifically, according to the prosecutor, Juror 275 became "openly hostile" and refused to admit that some participants in protests cause property damage or "riots." As we have already suggested, these reasons ultimately do

---

[28] A few weeks after *Douglas* was issued, our state Supreme Court decided *People v. Smith* (2018) 4 Cal.5th 1134. While *Smith* declined to decide whether a "mixed motives analysis" applies to *Batson/Wheeler* cases, it observed that "[a] prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*Smith*, at pp. 1157–1158, 1162, fn. 7.) We think it obvious that the same holds true for reasons that are facially discriminatory.

not hold up, but at the second stage we do not evaluate their plausibility. (See *Purkett v. Elem*, *supra*, 514 U.S. at p. 768.)  Rather, accepting them at face value, we conclude that Juror 275's supposed hostility and failure to respond accurately to the prosecutor's questions were race-neutral reasons for striking her.  (See, e.g., *People v. Winbush* (2017) 2 Cal.5th 402, 441 [juror's "lack of candor" is facially neutral reason for strike]; *People v. Reynoso* (2003) 31 Cal.4th 903, 917 [same as to juror's " 'body language or manner of answering questions' "]; *People v. Davenport* (1995) 11 Cal.4th 1171, 1203 [same as to juror's demeanor].)

We also conclude that these reasons were not categorically discriminatory on their face simply because they were tied to Black Lives Matter, given the low bar that currently binding authority has set for whether a prosecutor's explanation passes muster at the second stage.  For example, in *People v. Hamilton* (2009) 45 Cal.4th 863, the prosecutor exercised a peremptory strike against a Black prospective juror in part because the juror said he had " 'considerable sympathy for Black people on trial' and thought the justice system was unfair to Blacks."  (*Id.* at pp. 899, 901.)  The Supreme Court implicitly rejected the defendant's claim that this reason was not neutral, instead agreeing with the trial court that "a challenge based solely on the prospective juror's race is different from a challenge 'which may find its roots in part [in] the juror's attitude about the justice system and about society which may be race related.' "  (*Id.* at pp. 901–902; see *Douglas*, *supra*, 22 Cal.App.5th at p. 1171 [discussing *Hamilton*].)  Although such a reason will soon be presumptively invalid under Assembly Bill No. 3070 (see Code Civ. Proc., § 231.7, subds. (e)(2), (i)), until then we must adhere to the Court's reasoning on this issue.

Nor can we say that the prosecutor's reasons related to Black Lives Matter amounted to a proxy for race. The parties agree that "support for [Black Lives Matter] is correlated with race," as Black people are not only statistically more likely to support the movement but also linked with it in the "public consciousness." There is a line of decisions finding "discriminatory intent to be inherent in . . . generic 'group-based presuppositions' " about how a juror may view the case. (*Gutierrez, supra,* 2 Cal.5th at p. 1167–1168, quoting *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 825 [peremptory challenge based on prosecutor's assumption about attitude of juror who lived in "area heavily populated by poor [B]lack people"]; see, e.g., *Douglas, supra,* 22 Cal.App.5th at pp. 1171–1172 [prosecutor assumed jurors would react to victim in particular way merely because they were gay].) But our state Supreme Court has distinguished challenges based on *assumptions* about a juror from challenges based on a juror's actual beliefs, even if those beliefs are more likely to be held by a particular group. (*People v. Avila* (2006) 38 Cal.4th 491, 542–545 [Black prospective juror's negative view of police "based on her *personal experience* that police officers lied, not on a theoretical perception that she, a member of a minority group, might view the police with distrust"]; see *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386–1388 [discussing *Avila*].) Here, the prosecutor did not justify the challenge to Juror 275 based on assumptions about what attitudes the juror held because of her support for Black Lives Matter. Instead, the prosecutor purportedly based it on the juror's actual reaction and responses to questions about the movement. Under binding authority, these were sufficiently race-neutral reasons for the peremptory challenge at *Batson/Wheeler*'s second stage.

*F.	Insufficient Evidence Supports the Conclusion that the Peremptory Challenge of Juror 275 Was Not Motivated by Discriminatory Intent.*

Finally, we address whether the trial court erred by crediting the prosecutor's reasons for striking Juror 275 when ruling on the challenge for cause, thus effectively finding that defendants failed to prove purposeful discrimination.  We conclude it did.

1.	General legal standards

" '[A]t the third stage . . . , the "critical question . . . is the persuasiveness of the prosecutor's justification for [the] peremptory strike." [Citation.]  Usually, "the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' "  (*People v. Smith*, *supra*, 4 Cal.5th at p. 1147, quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339.)  "A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility."  (*Smith*, at pp. 1157–1158.)  " 'At this stage, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." ' "  (*People v. Johnson* (2015) 61 Cal.4th 734, 755, quoting *Miller-El*, at pp. 338–339.)

Because the analysis at this stage "focuses on the subjective genuineness of the reason [offered for striking a juror], not the objective reasonableness," a "trial court enjoys a relative advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility."  (*Gutierrez, supra*, 2 Cal.5th at pp. 1158–1159.)

60

Thus, we generally exercise " ' "great restraint" ' " when reviewing a "determination regarding the sufficiency of tendered justifications" for the strike, asking only whether it is supported by substantial evidence. (*Id.* at p. 1159.) "Reviewing the trial court's determination [that a particular reason is genuine] with restraint does not, however, mean abdication." (*People v. Hardy*, *supra*, 5 Cal.5th at p. 76.) Usually, such rulings "are entitled to deference only when the [trial] court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' " (*Gutierrez*, at p. 1159.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva*, *supra*, 25 Cal.4th at p. 386.)

### 2. Analysis

To reiterate, the record reflects that the prosecutor gave the following reasons for exercising a peremptory challenge against Juror 275: (1) the juror's hostility, including when questioned about Black Lives Matter; (2) the fact that the juror "disagreed that . . . there is a contingent within [the movement] which destroys property or . . . riots"; (3) the juror's negative opinion of law enforcement; (4) the fact the juror arrived late; and (5) the fact the juror appeared to "want[] absolutely nothing to do with this case."

These reasons do not hold up to scrutiny. As the record shows, and as the trial court explicitly ruled, Juror 275 did *not* deny that some people who participate in Black Lives Matter demonstrations destroy property. Of further concern, the prosecutor explained at one point that she asked such "questions about whether or not individuals could agree that maybe there is a

61

bad portion of this particular movement that they're in" to ascertain whether there was a risk of "jury nullification." To the extent the prosecutor assumed Juror 275 posed a risk of jury nullification based solely on her perceived involvement in Black Lives Matter, the assumption reflected an illegitimate reason for a peremptory challenge.

The prosecutor's reason that Juror 275 had arrived late was also baseless. It was Juror 211 who arrived late, not Juror 275. "Although an isolated mistake or misstatement . . . is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when . . . the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue." (*Silva*, *supra*, 25 Cal.4th at p. 385.) Here, the reason related to tardiness was unsupported in the record, was not an isolated mistake since the prosecutor offered at least one other reason that was unsupported in the record, and was more suggestive of discrimination because it stemmed from confusing one Black woman with another.

As we already touched on, the record also does not support the prosecutor's claim that Juror 275 held a negative opinion of law enforcement. The juror never indicated she would view the testimony of law enforcement officers differently from the testimony of other witnesses, and her views about the criminal justice system involved sentencing, not the police. While the prosecutor may have believed that Juror 275's support for Black Lives Matter indicated a negative opinion of law enforcement, the prosecutor did not ask any questions to ascertain whether the juror actually held such a belief. Again, since support for Black Lives Matter is not, as the parties concede, a race-neutral reason for striking a prospective juror, an assumption

about a juror's opinions based solely on that support cannot justify a peremptory challenge.

Moreover, as defendants observe, the prosecutor did not challenge other non-Black seated jurors who gave answers that *did* indicate a negative view of law enforcement. For example, Juror 197 wrote about an encounter with police during which she felt "victimized," leading her to "complain[] to the officer in charge." In response to the question about whether she had "any strong opinions about how police do their jobs," she responded, "I'm conflicted. I know the majority of police officers are fair and are just trying to do their job, which is to help people. But then you can't help being disturbed by some of the police killings that are in the news." Yet the prosecutor never asked the juror about these responses and never challenged her.

As another example, Juror 249 also indicated that she had "strong opinions about how police do their jobs." She explained, "I think racial profiling exists [and] I question the use of firearms in certain situations." Again, however, the prosecutor did not ask about this response in voir dire and never challenged the juror.

We recognize that the trial court did not believe it was making a third-stage ruling on the challenge to Juror 275. Accordingly, we do not fault it for not expressly addressing every reason the prosecutor gave, mentioning that not all of them were supported by the record, or conducting a comparative analysis. (Cf. *Silva, supra,* 25 Cal.4th at pp. 385–386.) Nonetheless, the parties agree that we can conduct a third-stage review in this case, and the court accepted the prosecutor's reasons that related to Juror 275's "anti-prosecution issues." Those reasons, in turn, include both one that was unsupported—that Juror 275 had a negative opinion of law enforcement—

and one that was untenable—that Juror 275 became hostile when subjected to concededly inappropriate questions about Black Lives Matter.[29]

In addition to the questioning of Juror 275 about Black Lives Matter, other aspects of the prosecutor's voir dire were also troubling.  The dialogue about Richmond and other areas the prosecutor perceived as "crime-ridden" recalls the questioning that led to reversal in *Gutierrez*.  In that case, one of the prosecution witnesses was a gang member from Wasco.  (*Gutierrez, supra*, 2 Cal.5th at pp. 1155, 1160.)  The prosecutor asked a Hispanic prospective juror who lived in Wasco whether she was aware of "gangs . . . that are active in the Wasco area," and the juror responded she was not.  (*Id.* at p. 1160.)  To explain his subsequent peremptory challenge to this juror, the prosecutor explained, " '[S]he's from Wasco and she said that she's not aware of any gang activity going on in Wasco, and I was unsatisfied by some of her other answers as to how she would respond when she hears that [the witness] is from a criminal street gang . . . out of Wasco.' "  (*Ibid.*)

The *Gutierrez* defendants argued that the so-called "Wasco reason" was not facially neutral because the prosecutor "was effectively using an individual's residence in Wasco as a proxy for Hispanic ethnicity," since census data showed that about 75 percent of Wasco residents identified as Hispanic or Latino.  (*Gutierrez, supra*, 2 Cal.5th at pp. 1167–1168.)  The

---

[29] As we have said, in ruling on the cause challenge to Juror 275, the trial court indicated that the juror consistently "did not respond well to [the prosecutor]," not just once the topic of Black Lives Matter arose.  The prosecutor, however, repeatedly linked the juror's hostility to questioning about Black Lives Matter, when justifying both the cause challenge and the peremptory challenge.  Accordingly, whatever the court may have believed about the juror's general attitude toward the prosecutor, the prosecutor's actual reason was the juror's demeanor in response to questions involving Black Lives Matter.

defendants relied on *Bishop*, in which "the prosecutor explained that he felt [a Black] eligibility worker who lived in Compton was likely to be hostile to law enforcement and desensitized to violence. [Citation.] [The Ninth Circuit Court of Appeals] found discriminatory intent to be inherent in these generic 'group-based presuppositions' that 'one who lives in an area heavily populated by poor [B]lack people could not fairly try a [B]lack defendant.' " (*Gutierrez*, at p. 1167, discussing *United States v. Bishop*, *supra*, 959 F.2d 820.)

The Supreme Court determined that the Wasco reason was facially neutral, explaining that it was "not inherently based on stereotypical views of Wasco residents" because of "the prosecutor's articulated basis referencing [the witness's] Wasco gang affiliation." (*Gutierrez*, *supra*, 2 Cal.5th at pp. 1167–1168.) But the Court also concluded that the trial court's third-stage ruling that the defendants failed to prove purposeful discrimination "was unreasonable in light of the record of voir dire proceedings," focusing on the fact it was not "self-evident" why the juror's unawareness of Wasco gang activity would cause the juror to be biased against the witness. (*Id.* at pp. 1169–1172.)

In reaching its holding, the Supreme Court noted that it was "conceivable . . . that the prosecutor genuinely believed gang activity to be so rampant in Wasco that this [juror] must have been either untruthful or uninformed in denying her awareness of Wasco gang activity," although the prosecutor had failed to articulate this reasoning. (*Gutierrez*, *supra*, 2 Cal.5th at p. 1169.) But even if a prosecutor did justify a strike "with the belief that a panelist's professed unawareness of gang activity indicated her dishonesty or ignorance, the basis for such a belief would compel further scrutiny. Insofar as a prosecutor's challenges might be guided by an

ungrounded assumption that Hispanic or Latino residents of Wasco (a community that is predominantly Hispanic or Latino) *should* be aware of gang activity in their neighborhood, a court might query whether this reasoning is inherently neutral as to race or ethnicity."  (*Id.* at p. 1169, fn. 7.)

The prosecutor here justified her peremptory challenges to both Jurors 211 and 313 on a basis similar to that *Gutierrez* posited, that these jurors' unawareness of crime or gang activity in Richmond and positive views of the city showed they "either choose[] not to accept reality or choose[] not to see what's around [them]."  Although our record does not contain demographic data about Richmond, the prosecutor's comments strongly suggest that she associated crime in that city, and the other Bay Area communities she deemed "gang-infested," with Black people.  She explained that she did not persist in questioning jurors unless their views of their communities, "which [she] happen[ed] to know well because of [her] area . . . where [she] practice[d]," diverged from hers.  In turn, she explicitly tied her legal practice to race, saying she had "dedicated the majority of [her] career to Black-on-Black crime" and worked long hours "because there is a complete violence that is out of control that is taking young African-Americans from us."

Thus, it is reasonable to infer that the prosecutor's belief that Jurors 211 and 313 should have been aware of crime in Richmond was based on her belief that they should be aware of crime in Richmond's *Black community*.  As *Gutierrez* suggests, a strike based on such reasoning would not be race-neutral.  Although we ultimately need not decide whether the prosecutor's reasons for striking Jurors 211 and 313 were pretextual, the prosecutor's reliance on these jurors' disagreement with her negative view of

their city reinforces our conclusion that the peremptory challenge to Juror 275 was discriminatory.

In sum, we hold that the denial of the *Batson/Wheeler* motion as to Juror 275 "was unreasonable in light of the record of voir dire proceedings" (*Gutierrez, supra*, 2 Cal.5th at p. 1172), because the record lacks evidence on which the trial court could have concluded that the challenge to Juror 275 was not " 'motivated in substantial part by discriminatory intent.' " (*Foster, supra*, 578 U.S. 1023, 136 S.Ct. at p. 1754.) The prosecutor's reasons for striking Juror 275 were either unsupported or based on inappropriate questioning about Black Lives Matter, and the court erred by crediting them.

We conclude by mentioning that "courts cannot discern a prosecutor's subjective intent with anything approaching certainty. But the issue is not whether the evidence of improper discrimination approaches certainty or even amounts to clear and convincing proof. The ultimate issue is 'whether it was *more likely than not* that the challenge was improperly motivated.' [Citation.] This probabilistic standard is not designed to elicit a definitive finding of deceit or racism. Instead, it defines a level of risk that courts cannot tolerate in light of the serious harms that racial discrimination in jury selection causes to the defendant, to the excluded juror, and to 'public confidence in the fairness of our system of justice.' " (*Gutierrez, supra*, 2 Cal.5th at pp. 1182–1183 (conc. opn. of Liu, J.).) Because this standard was satisfied here, we are compelled to conclude that "defendants were denied their right to a fair trial in violation of the equal protection clause of the federal Constitution and their right to a trial by a jury drawn from a representative cross-section of the community under the state Constitution." (*Id.* at p. 1172.)

67

# III.
## DISPOSITION

The judgments are reversed.

_____

Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

Sanchez, J.

*People v. Silas et al.*  A150512

69

Trial Court:        Superior Court of Contra Costa County

Trial Judge:        Hon. Clare Marie Maier

Counsel for Defendants and Appellants:

Alex Coolman, under appointment by the Court of Appeal, for Sheldon Silas

Barry M. Karl, under appointment by the Court of Appeal, for Reginald Whitley

Stephen B. Bedrick, under appointment by the Court of Appeal, for Lamar Michaels

Ross Thomas, under appointment by the Court of Appeal, for Linda Chaney

Counsel for Plaintiff and Respondent:

Xavier Becerra and Rob Bonta, Attorneys General; Lance E. Winters, Chief Assistant Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Rene A. Chacon, Supervising Deputy Attorney General; Moona Nandi, Deputy Attorney General

Counsel for Amici Curiae on behalf of Defendants and Appellants:

Easha Anand, James W. Craig, MacArthur Justice Center; Daniel A. Rubens, Elizabeth Cruikshank, Tiffany R. Wright, Sarah H. Sloan, Orrick Herrington & Sutcliffe

Ezekiel R. Edwards, Jason D. Williamson, Cassandra Stubbs, American Civil Liberties Union Foundation

Shilpi Agarwal, American Civil Liberties Union Foundation of Northern California

Elias Batchelder, Office of the State Public Defender

Stephen K. Dunkle, John T. Philipsborn, California Attorneys for Criminal Justice

Elisa Della-Piana, Tifanei Ressl-Moyer, Lawyers' Committee for Civil Rights of the San Francisco Bay Area

*People v. Silas et al.*  A150512